[No. A067893. First Dist., Div. Two. May 30, 1996.]

J & K PAINTING CO., INC., Plaintiff and Appellant, v.
VICTORIA L. BRADSHAW, as Labor Commissioner, etc., Defendant and
Appellant.

COUNSEL

Mark R. Thierman and Matthew J. Ruggles for Plaintiff and Appellant.

Ramon Yuen-Garcia for Defendant and Appellant.

OPINION

**KLINE, P. J.**—Under the prevailing wage law (Lab. Code, §§ 1720-1780),[1] a public entity which has contracted for a public works project must withhold statutory penalties as well as underpaid wages upon learning that a contractor or subcontractor on the project has violated the law by paying less than the prevailing wage to its employees. (§ 1727.) The amount of the penalties, up to a statutory ceiling, is to be "determined" by the Commissioner of Labor (Commissioner) in light of specified factors. (§ 1775.) The Commissioner's undisputed practice is to make this determination, through the Division of Labor Standards Enforcement (Division), *after* instructing the contracting agency to withhold funds including an allowance for penalties in the maximum statutory amount. On petition of J & K Painting Co. (PaintCo), the court below held this practice invalid and issued a writ of mandate setting aside, as premature, a "notice to withhold" previously issued

---

[1] Except as otherwise indicated, all statutory references are to the Labor Code.

by the Division. We have concluded that this was error. The notice to withhold may have been superfluous, but its issuance was not unlawful. More specifically, nothing in the statutes requires the Commissioner to exercise her penalty-fixing discretion before a contracting agency withholds funds.

## I.

As pertinent here, the prevailing wage law requires that all workers on public works projects be paid at least the "prevailing wage." (§§ 1771, 1774.) For any violation of this requirement, the general contractor on the affected project shall "forfeit" the amount of the underpayments, plus a penalty. (§ 1775.) The contracting public entity (the "awarding body") is required to withhold from any payments due the contractor "all wages and penalties which have been forfeited" by virtue of those violations. (§ 1727.) When the withholding is on account of a violation by a subcontractor, the contractor is entitled to withhold from the subcontractor "sufficient sums to cover any penalties withheld from [the contractor] by the awarding body." (§ 1729.)

From 1963 through 1989, penalties for failure to pay the prevailing wage were fixed at $25 per worker per day of underpayment. (Former § 1775, printed in 44 West's Ann. Lab. Code (1989 ed.) pp. 548-549; cf. id., Historical and Statutory Notes (1996 pocket pt.) p. 129.) In 1989, the statutes were amended to provide, among other things, a penalty of "not more than" $50 per worker per day, the amount to be "determined" by the Commissioner "based on consideration of" specified factors involving the violator's state of mind and past record of compliance or noncompliance. (§ 1775 as amended by Stats. 1989, ch. 1224, § 6, p. 4781.)[2]

## II.

According to the pleadings and declarations before the trial court, PaintCo was a painting subcontractor under a public works contract between the

---

[2]"The contractor shall, as a penalty . . . , forfeit not more than fifty dollars ($50) for each calendar day, or portion thereof, for each worker paid less than the prevailing rates . . . . The amount of this penalty shall be determined by the Labor Commissioner and shall be based on consideration of the contractor's mistake, inadvertence, or neglect in failing to pay the correct rate of prevailing wages, or the previous record of the contractor in meeting his or her prevailing wage obligations, or a contractor's wilful failure to pay the correct rates of prevailing wages. A mistake, inadvertence, or neglect in failing to pay the correct rate of prevailing wages is not excusable if the contractor had knowledge of his or her obligations under this part. The difference between the prevailing wage rates and the amount paid to each worker for each calendar day or portion thereof for which each worker was paid less than the prevailing wage rate shall be paid to each worker by the contractor, and the body awarding the contract shall cause to be inserted in the contract a stipulation that this section will be complied with."

County of Santa Clara (County) and S. J. Amoroso, Inc. (Amoroso). The County recorded a notice of completion on June 2, 1993. On June 30, a deputy labor commissioner issued a "notice to withhold," purporting to direct the County to withhold $65,154.42 from Amoroso, as general contractor, based on violations by PaintCo of the prevailing wage law. This sum included $21,500 in penalties assessed at $50 per worker-day, the maximum statutory rate. About six weeks *after* issuing the notice, a staff attorney for the Commissioner reviewed the file, concluded that PaintCo had falsified payroll records, and decided not to reduce the penalty.

Meanwhile the County withheld the specified sums from Amoroso. Amoroso apparently withheld similar sums from PaintCo. After trying unsuccessfully to intervene in another proceeding involving the funds, PaintCo instituted this action to challenge the Commissioner's supposed practice of "imposing" penalties at the maximum rate prior to any exercise of her statutory discretion to fix a lower penalty. PaintCo prayed for a writ "ordering [the Commissioner] to exercise her discretion as required by statute and initiate a full investigation into the alleged prevailing wage violations of Petitioner, and all others similarly situated, and make a determination before imposing any penalties under Labor Code § 1775," and to "cease and desist from arbitrary assessment of penalties against Petitioner, as well as all contractors similarly situated . . . and . . . conduct a full investigation into any alleged violations of the prevailing wage laws before a penalty is assessed and make a determination as to the penalty's propriety and correctness, as required by Labor Code §§ 1727 and 1775." In response, the Commissioner relied primarily upon procedural defenses, such as that PaintCo lacked standing to maintain the present proceeding.

Implicitly rejecting the Commissioner's defenses, the trial court reached the merits and granted relief. It reasoned commonsensically that a penalty cannot be "assessed" until its amount has been "determined"; therefore the Commissioner must exercise her statutory discretion to determine the appropriate penalty *before* she can instruct an awarding body to withhold funds.

The court directed the Commissioner "to set aside the Notice to Withhold issued on June 30, 1993, and to consider the factors set out in Labor Code section 1775 prior to assessment of any penalty . . . ."

Some eight weeks later, while posttrial proceedings were still underway, the Division issued an "Amended Notice to Withhold as to Penalties Only" by which it again directed the County to withhold the maximum penalty, $21,500. Attached to the amended notice was a declaration from a senior deputy labor commissioner stating that the Division's investigation of PaintCo's violations revealed a "deliberate and fraudulent attempt to not pay the

prevailing wages." Without expressly acknowledging the Commissioner's issuance of the amended notice, the court entered judgment reiterating its original order and stating that any amended notice issued in compliance with its terms would receive "retroactive effect."

PaintCo appealed, primarily challenging the retroactivity provision and contending that the supposed defects in the original "notice to withhold" precluded *any* recovery of penalties against PaintCo. The Commissioner cross-appealed, challenging the judgment itself. Both parties also challenged postjudgment orders allowing and denying attorney fees.

### III.

■ The Commissioner raises a series of procedural defenses. She invokes the requirement that a petitioner in mandamus must possess a "beneficial interest" sufficient to warrant the relief sought. (See Code Civ. Proc., § 1086.) Under this principle, relief is unavailable " 'where the plaintiff fails to show that it will subserve or protect some right or interest of his . . . [or] "where it is apparent that the relator has no direct interest in the action sought to be coerced, and that no benefit can accrue to him from its performance." ' " (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]; see *Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 451 [279 Cal.Rptr. 834, 807 P.2d 1063]; *Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) The petitioner must generally have "some special interest to be served or some particular right to be preserved or protected"—not a "technical, abstract or moot right"—and must show that his or her "legal rights are injuriously affected by the action being challenged." (*Braude* v. *City of Los Angeles* (1990) 226 Cal.App.3d 83, 87 [276 Cal.Rptr. 256].)

According to the Commissioner, PaintCo was not aggrieved by the assertedly illegal withholding order because the withholding of funds was directed against Amoroso, the general contractor. The Commissioner does not dispute, however, that Amoroso in turn withheld funds from PaintCo, as section 1729 expressly empowered it to do. PaintCo was therefore directly aggrieved by the withholding, and possesses a direct interest in a determination of its lawfulness.

Similarly, the Commissioner contends that PaintCo lacks "standing" to "enforce" the rights of Amoroso. However, PaintCo is asserting not Amoroso's rights, but its own interest in a lawful determination of the amount of

penalties which may be withheld from payments to which *it* is entitled for work *it* performed.

■ The Commissioner contends that mandamus was precluded because PaintCo had one or more "plain, speedy, and adequate remed[ies] in the ordinary course of law." (Code Civ. Proc., § 1086.) She identifies three proposed remedies: (1) a statutory suit, under an assignment from the general contractor, for the recovery of penalties from the awarding body; (2) recordation of a stop notice against the project for nonpayment under the subcontract; and (3) suit against the general contractor under the subcontract.

None of these proceedings would afford the relief sought here by PaintCo, i.e., a determination that the practice regularly employed by the Commissioner to collect penalties is unlawful, and a writ commanding that it cease. A statutory suit against the awarding body would be "limited to the *recovery* of the wages and penalties," and would permit "[n]o other issues" to be "presented to the court." (§ 1733.) The statutory stop-notice procedure is at least equally limited, and (indulging the doubtful assumption that it might otherwise be applicable) could well become time-barred before an aggrieved subcontractor even learned funds were being withheld.[3] A suit against the contractor on the subcontract cannot afford any relief against the awarding body or the Commissioner, and would typically be subject to arguably preclusive defenses based either on customary contract clauses or on the provisions of the prevailing wage law itself.[4]

---

[3] A stop notice must be filed within 30 days after recordation of a notice of completion. (Civ. Code, § 3184, subd. (a).) Here the Division's "notice to withhold" advising the County of alleged violations was issued 28 days after recordation of the notice of completion. There is no evidence that PaintCo even became aware of the notice within the two remaining days ' before the time expired for filing a stop notice.

[4] Under a "pay when paid" clause, for example, the subcontractor's entitlement to payment is conditioned on the contractor's own receipt of funds from the owner. Such clauses have produced a good deal of litigation in other jurisdictions. (E.g., *A.A. Conte* v. *Campbell-Lowrie-Lautermilch* (1985) 132 Ill.App.3d 325, 329-330 [87 Ill.Dec. 429, 477 N.E.2d 30, 33-34] [clause creates valid condition precedent to payment]; *Architectural Systems, Inc.* v. *Gilbane Bldg. Co.* (D.Md. 1991) 760 F.Supp. 79, 82 [clause shifted risk of owner's insolvency from contractor to architect]; *West-Fair Elec.* v. *Aetna Cas. & Sur. Co.* (1995) 87 N.Y.2d 148, 158 [638 N.Y.S.2d 394, 661 N.E.2d 967, 971] [provision void as against New York public policy]; *F.W. Sims, Inc.* v. *Federal Ins. Co.* (E.D.N.Y. 1992) 788 F.Supp. 149, 151, and cases cited [summary judgment denied due to factual issues whether clause was intended to shift risk to subcontractor].) The only known decision in California concerning such a clause is currently under review by the Supreme Court. (*Wm. R. Clarke Corp.* v. *Safeco Ins. Co.* (1995) 47 Cal.App.4th 1352 [46 Cal.Rptr.2d 183], review granted Jan. 31, 1996 (S050148).)

Even without such defenses, the contractor would undoubtedly take the position that its statutory entitlement to withhold payments from the subcontractor under section 1729 was a defense to any action on the subcontract; that it had acted as a mere conduit for payment of

The Commissioner suggests that, apart from questions of the *adequacy* of other remedies, section 1732 explicitly provides the *exclusive* remedy for one in PaintCo's position. By its terms this statute applies only to "the contractor or his or her assignees."[5] PaintCo falls within the statute only if it was an assignee of Amoroso's claims for the withheld funds.[6] The statute perhaps should, but does not, declare that a subcontractor becomes an assignee of the contractor's rights by operation of law where, as here, the contractor passes retained penalties to the subcontractor by in-turn withholding. The Commissioner therefore fails to establish that PaintCo can or should be viewed as an "assignee" of Amoroso's statutory right of action.[7]

---

the sums withheld; that it was under no obligation to contest a notice to withhold issued on account of alleged violations by the subcontractor; and that the subcontractor waived its rights to the sums, or failed to mitigate its contract damages, by failing to proceed against the involved public agencies. We of course express no view as to the soundness of any such defenses.

[5]"Notwithstanding any other provision of law, the time for action by the contractor or his or her assignee for the recovery of wages or penalties is limited to the 90-day period and suit on the contract for alleged breach thereof in not making the payment is the exclusive remedy of the contractor or his or her assignees with reference to those wages or penalties." (§ 1732.)

[6]The Commissioner has not suggested that the reference to "contractor" in section 1733 should be read as including a reference to "subcontractor." Such an argument might be invited by section 1722.1, which provides, "For the purposes of this chapter, 'contractor' and 'subcontractor' include a contractor, subcontractor, licensee, officer, agent, or representative thereof, acting in that capacity, when working on public works . . . ."

We do not believe that in enacting this language, the Legislature could possibly have intended a blanket conflation of the terms "contractor" and "subcontractor." If read to make "subcontractor" and "contractor" mutually inclusive for all purposes, the statute would create superfluities, ambiguities, and absurdities throughout the act. (E.g., § 1774 [contractor "and any subcontractor under him" shall pay prevailing wage]; § 1775 ["contractor" to forfeit penalties for underpayment of any worker employed by the contractor "or by any subcontractor under him"].) Instead the statute was presumably intended to mean that the terms "contractor" and "subcontractor," *respectively*, include persons or entities (agents, representatives, or others) acting on their behalf. Even with this gloss, the intent of the term "include" remains highly ambiguous. Indeed it is difficult to escape the conclusion that the act as a whole is exceptionally poorly drawn.

[7]The real gist of the Commissioner's argument appears to be that the statute impliedly *required* a subcontractor in PaintCo's position to *obtain* an assignment from the contractor, and that failure to do so was fatal to any other attempt to secure relief. No such requirement is *expressly* imposed, and a Legislative intent to create remedial exclusivity will not be inferred where the remedy in question is "patently inadequate." (*B & P Development Corp.* v. *City of Saratoga* (1986) 185 Cal.App.3d 949, 962 [230 Cal.Rptr. 192].) A remedy which depends for its very existence on the will or whim of another certainly appears "patently inadequate."

In a further twist, however, PaintCo *alleged* in its petition that it received an assignment of Amoroso's rights. Neither party mentioned this allegation to the trial court (or this court), or otherwise appeared to notice it. Ordinarily a damaging factual concession in a pleading is binding as a judicial admission. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 408-409, pp. 456-457.) Had that doctrine been invoked below, however, the allegation might have been revealed as a result of haste or inadvertence, in which event PaintCo might have sought

Even if PaintCo stood in the shoes of the general contractor for purposes of section 1732, that statute would not preclude maintenance of this action insofar as PaintCo seeks relief other than the recovery of penalties. Assuming arguendo that PaintCo was an assignee, we might be inclined to sustain the "exclusive remedy" argument but for the fact that the relief prayed for in PaintCo's petition simply does not overlap with the relief contemplated by section 1732. PaintCo prayed for a writ of mandamus directing the Commissioner to (1) "exercise her discretion as required by statute and initiate a full investigation . . . and make a determination before imposing any penalties under Labor Code § 1775," (2) "cease and desist from arbitrary assessment of penalties against [PaintCo], as well as all contractors similarly situated," and (3) "conduct a full investigation into any alleged violations of the prevailing wage laws before a penalty is assessed and make a determination as to the penalty's propriety and correctness . . . ." The statute contemplates only an "action by the contractor or his or her assignee for the recovery of wages or penalties." (§ 1732.) Since the statute does not purport to afford a remedy for the types of wrongs alleged in the petition, it cannot be deemed the exclusive remedy for such wrongs. (See *Orloff* v. *California Turf Club* (1947) 30 Cal.2d 110, 113 [180 P.2d 321, 171 A.L.R. 913]; 3 Witkin, Cal. Procedure, *supra*, Actions, §§ 7-9, pp. 38-40; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645] [judgment reversed insofar as it allowed recovery of penalties outside terms of section 1732, but upheld insofar as it invalidated application of unconstitutional statute].)

We find no procedural impediment to PaintCo's maintenance of this proceeding.[8]

---

obtained relief from the admission. (See *id.*, §§ 408, 411, pp. 456, 458.) In any event, for the reasons indicated in the text, the allegation would not have been fatal to PaintCo's right to maintain the present action.

[8]In addition to the defenses discussed in the text, the Commissioner raised two other purely procedural objections to the proceeding. The first was that PaintCo lacked standing to proceed with the action because any cause of action had vested in the bankruptcy trustee upon PaintCo's filing of a petition in bankruptcy court. This argument is unsound. (See *Baltins* v. *James* (1995) 36 Cal.App.4th 1193, 1201 [42 Cal.Rptr.2d 896]; *California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 729 [284 Cal.Rptr. 687]; *Robinson* v. *McGinn* (1987) 195 Cal.App.3d 66, 79 [240 Cal.Rptr. 423], disapproved on another point in *Laird* v. *Blacker* (1992) 2 Cal.4th 606, 617 [7 Cal.Rptr.2d 550, 828 P.2d 691].) The case cited by the Commissioner is inapposite since it concerned an action filed by a debtor under chapter 7, not a debtor in possession under chapter 11. (*In re Louden* (E.D.Ky. 1989) 106 Bankr. 109, 111-112, quoting Fed. Rules Bankr. Proc., rule 6009.) Here the bankruptcy proceeding was apparently commenced under chapter 11. Although it was (apparently) converted at some point to a chapter 7 matter, the record fails to establish when this occurred. Since the defense

## IV.

■ The parties appear to share two fundamental misconceptions, which they imparted to the trial court, which in turn adopted them as an intrinsic part of its reasoning. The first is that the Commissioner possesses the statutory power to "assess" or "impose" penalties on public works contractors for prevailing wage violations. The second is that she exercised this power in this case, and exercises it in others, by issuing a "notice to withhold" reciting the supposed facts of a violation and purporting to "direct" the awarding body to withhold funds. These suppositions may reflect the Commissioner's actual practices as conceived by the Division and by industry participants. They lack any apparent basis, however, in written law.

The statutes are devoid of any provision empowering or obligating the Commissioner to assess or impose penalties or to compel an awarding body to withhold them.[9] Nor do they mention anything like the "notice to withhold." Contrary to the notion that the awarding body must receive any such formal notice, section 1726 requires it to "take cognizance" of violations, however they come to its attention, and section 1727 imposes on it a seemingly unconditional duty to "withhold and retain" from the contractor "all wages and penalties which have been forfeited . . . ." The Division's "notice to withhold" therefore appears legally superfluous, except insofar as it may have imparted knowledge to the County of the alleged violations.

This conclusion, while dispelling some of the confusion generated by the parties' respective contentions, fails to answer the central question, i.e.,

does not appear on the face of the record, it was the Commissioner's burden to substantiate it. She failed to do so.

Similarly, the defense of res judicata (claim preclusion) fails for want of evidence of a *judgment* against PaintCo—let alone one which was final, on the merits, and on the same cause of action. (See *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593]; *Castro* v. *Higaki* (1994) 31 Cal.App.4th 350, 357 [37 Cal.Rptr.2d 84]; 7 Witkin, Cal. Procedure, *supra*, Judgment, §§ 194, 217, pp. 630, 655; *Vella* v. *Hudgins* (1977) 20 Cal.3d 251, 257 [142 Cal.Rptr. 414, 572 P.2d 28] [burden of proof].)

[9] Nor do we find any pertinent regulations. Section 1773.5 empowers the Director of Industrial Relations to "establish rules and regulations for the purpose of carrying out this chapter, including, but not limited to, the responsibilities and duties of awarding bodies under this chapter." No published rule or regulation, however, empowers the Commissioner or the Division to order an awarding body to withhold funds. (Cf. Cal. Code Regs., tit. 8, §§ 16434-16439 [regulations applicable to awarding bodies which have adopted compliance programs].) Under section 1773.5, the director possesses the power to adopt pertinent regulations; a suitable exercise of that power would certainly appear to be an appropriate means to introduce the procedural clarity now missing from the process.

whether the Commissioner must "determine" the amount of penalties before the awarding body can properly withhold funds. Although PaintCo's own argument does not come to grips with this issue, the reasoning employed by the trial court suggests a possible argument in PaintCo's favor. The court reasoned that a penalty cannot be "assessed" until its amount has been determined. As we have noted, the term "assess" subtly misstates the true purport of section 1727, which is that the awarding body must *withhold* sums sufficient to meet the contractor's obligation for penalties (as well as underpaid wages). An argument resembling the trial court's reasoning might nonetheless be constructed as follows: Section 1727 obligates the awarding body to withhold sums which "have been forfeited." The use of the present perfect tense suggests that the contemplated act (forfeiture) has been completed—or, in grammatical terms, perfected—prior to the withholding. The common meaning of "forfeit" is to "lose" or "lose the right to." (6 Oxford English Dict. (2d ed. 1989) p. 67.) A forfeiture in this sense might be conceived as incomplete until perfected through judicial process or lapse of time. Arguably, money will not "have been forfeited" in this sense without a determination, at some intervening point, of its amount. It might therefore be contended that the quoted phrase contemplates a prior determination of penalties by the Commissioner.

The weakness in this argument is that the posited interpretation of "forfeit" would create a temporal impossibility under *any* reading of the statute. The act of withholding is itself preliminary to, and can therefore *never* be preceded by, a *perfected* forfeiture. It remains subject to court challenge until the time for such challenge elapses 90 days after "completion of the contract and formal acceptance of the job." (§ 1730.) Thus even if the Commissioner exercised her discretion to determine penalties at the earliest conceivable moment, the forfeiture (in the sense contemplated by this argument) would remain incomplete and unperfected.

Fortunately, a more reasonable interpretation presents itself. To "forfeit" means not only to "lose," but also *"to render oneself liable* to be deprived of (something)." (6 Oxford English Dict., *op. cit. supra*, p. 67, italics added; accord, Black's Law Dict. (6th ed. 1990) p. 650.) In this sense one may "forfeit" a thing immediately upon engaging in the *conduct* which subjects the thing to loss. Thus, for example, as John Locke wrote, a conqueror "has an absolute power over the lives of those who, by putting themselves in a state of war, have forefeited them." (Locke, Two Treatises of Government (1690).) A contractor may therefore be said to have "forfeited" underpaid wages and penalties the moment he or she violates the prevailing wage law—regardless whether the violation has been discovered, or its magnitude

or blameworthiness has been ascertained. From that point on it is accurate to say that the underpaid wages and penalties "have been forfeited," although in other senses of that phrase the forfeiture may remain incomplete and unperfected.

It follows that section 1727 does not require that penalties be "determined," as that term is used in section 1775, before the awarding body is empowered (or obligated) to withhold them. This conclusion receives substantial support from other textual evidence, notably the statute's further provision that withholding must be preceded by a "full investigation" of alleged violations, *except* where it affects the final payment under the contract. Implicitly, where only the final payment remains due, the awarding body may be required to withhold sums *without a prior investigation*. The Legislature could not have intended that the Commissioner make a discretionary determination of penalties without the benefit of an investigation. The stated exception therefore necessarily implies that the awarding body's power and duty to withhold penalties is *not* contingent upon such a determination, but may be predicated on a preliminary or tentative estimation of penalties.

Further support for this view appears in the legislative materials surrounding the 1989 amendments to section 1775, which granted the Commissioner the power to "determine" penalties. The amendments were part of a larger bill to improve the rate of compliance with the prevailing wage laws. Over four years of legislative hearings the Assembly Labor and Employment Committee had "found evidence that the majority of state and local public agencies contracting for public works institute ineffective programs to insure compliance with labor law requirements. As a consequence, contractor noncompliance with these provisions appear[s] to be endemic throughout the state." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) as introduced on Dec. 12, 1988.) In his letter of transmittal to the Governor, the bill's author summarized its intent as "to significantly improve compliance with the wage and apprenticeship requirements for public works contracts . . . ." (Letter of Sept. 19, 1989, from Assemblyman Richard E. Floyd to Governor George Deukmejian, contained in Governor's chaptered bill file, Stats. 1989, ch. 1224 (Floyd Letter).)

The increase in the maximum penalty for prevailing wage violations was obviously intended to heighten the deterrent effect of those penalties. At the same time, the Legislature sought to grant the Commissioner the power to "compromise" in appropriate cases. The legislative record contains several references to an October 1985 interpretive bulletin in which the Commissioner had "stat[ed] that the division ha[d] no power to compromise or settle

any penalty assessment." (Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated Sept. 10, 1989, p. 4; see Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) as amended Apr. 10, 1989; Dept. of Industrial Relations, Enrolled Bill Rpt. on Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated Sept. 19, 1989, pp. 4-5.) The author of the bill wrote that the penalty provisions "were changed to give the Labor Commissioner the discretion of <u>not</u> monetarily penalizing a contractor when the contractor commits an honest or inadvertent error in paying wages. Current law allows no such latitude with its strict liability requirements of $25 per day, per employee for each violation." (Floyd Letter, underlining in original.)

In short, the amendments served a twofold purpose: to increase the maximum penalty where no mitigating circumstances appeared, while empowering the Commissioner to reduce or forego penalties where the violation was innocent or the violator had a good record of past compliance. As a result, the legislative materials speak of the discretion to reduce penalties not as a *restriction* on the Commissioner's enforcement powers, but as an *enhancement* to those powers. The Senate Floor Analysis states that the bill "[i]ncreases the penalty . . . but *authorizes* the Labor Commissioner to reduce the amount of the penalty based on specified criteria." (Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated Sept. 10, 1989, p. 1.) The Assembly Floor Analysis states that the bill would "[c]hange the penalty . . . and would *permit* the Labor Commissioner to dismiss or lower a penalty where the contractor has made an honest error." (Assem. Office of Research, 3d reading analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated June 30, 1989, p. 2; see Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) as introduced on Dec. 12, 1988 [same]; Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) as amended Apr. 10, 1989 [same]; Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.), as amended Apr. 10, 1989 [same]; Sen. Com. on Industrial Relations, Analysis of Assem. Bill 114 (1989-1990 Reg. Sess.) as amended Apr. 10, 1989 [would "authorize" Commissioner to reduce amount of penalty; would "give the division the power" to decrease penalty]; Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) as amended Apr. 10, 1989 [same]; Dept. of Industrial Relations, Enrolled Bill Rep. on Assem. Bill 114 (1989-1990 Reg. Sess.) dated Sept. 19, 1989, pp. 1, 5.)

The only interpretation lending any support to PaintCo's implicit interpretation appears in an Enrolled Bill Report by the Division of Transportation which, while recommending that the bill be signed, noted the following argument in opposition: "Under the bill there would no longer be a specified

penalty for not paying prevailing wages . . . . A sliding scale of penalties will require Caltrans to contact the Director of Industrial Relations prior to making each penalty assessment for a prevailing wage violation." (Dept. of Transportation, Enrolled Bill Rep. on Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated Sept. 19, 1989, p. 2.) This statement, emanating as it does from an executive Division, is less indicative of legislative purpose than the numerous other sources cited above. Moreover, subsequent developments appear to conflict with the assumption that agencies like the California Department of Transportation (CalTrans), which have their own enforcement programs, must seek a prewithholding determination of penalties from the Commissioner.[10] We have found no other suggestion that the 1989 legislation would require a prewithholding determination by the Commissioner.

At bottom, the power to withhold funds is a device in aid of collection—a means to prevent violators from evading their financial responsibility by dissipating the proceeds of the contract before their statutory obligations can be enforced. The purpose of the 1989 amendments was not to impede the use of this device, but to increase the Commissioner's flexibility in applying it. The statutes are most reasonably understood to contemplate that when an awarding body learns of prevailing wage violations, it acts properly by withholding an amount including the maximum penalty to which the contractor is *subject*, at least where the Commissioner acts reasonably promptly to consider the enumerated factors and "determine" whether a lower penalty is appropriate.

The procedure employed here appears to comply with this interpretation. According to the declaration of the Division's counsel, the "notice to withhold" was generated by an "investigator." "[I]nvestigators," declared counsel, "do not have the discretion to assess the amount of the penalties under Labor Code, Section 1775." The statutory discretion is instead "exercised by their superiors and also by [staff attorneys] for [the Commissioner]." In this case, the declarant himself reviewed the case approximately six weeks after the notice to withhold was issued. He concluded that a violation had occurred and that "there was no excusable mistake, inadvertence or neglect," because "the certified payroll records, made under penalty of perjury, submitted by [PaintCo] were falsified in that they showed less work

---

[10]The 1989 amendments also contained provisions encouraging awarding bodies to adopt their own "labor compliance programs." (§§ 1771.5, 1771.6) CalTrans had already "pioneered" such a program—one so "highly regarded" that it provided the model for the legislation. (Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 114 (1989-1990 Reg. Sess.) dated Sept. 10, 1989, p. 4.) The regulations subsequently adopted to govern such programs are far from plain, but some of their language appears to contemplate that in at least some cases, the Commissioner's prewithholding input will be required only where it is requested by the awarding body. (Cal. Code Regs., tit. 8, § 16437, subd. (a).)

hours than were reflected in petitioner's own time cards for work performed by the workers on the project." Accordingly, the penalties were not reduced. However, he declared, the discretion to determine penalties "has been and is being exercised by [the Commissioner]." In exercising that discretion, she "has assessed penalties substantially lower than the maximum amount authorized in approximately eighty (80) to ninety (90) percent of the cases."

We hold that section 1775 does not condition an awarding body's power or duty to withhold on a prior determination by the Labor Commissioner of whether to assess reduced penalties. Where the awarding body learns of violations, by notification from the Division or otherwise, it may—subject to the requirement of prior investigation as set forth in section 1727—withhold an amount sufficient to cover apparent underpayments and the *maximum* amount of penalties, provided the Commissioner exercises her discretion promptly thereafter to determine the actual amount of the penalty, taking into consideration the factors enumerated in section 1775. The awarding body must, of course, promptly release any sums withheld in excess of this amount.

Since it appears that these procedures were substantially followed here, there was no basis for issuance of a writ of mandamus. Accordingly, the judgment is reversed.[11]

Phelan, J.,* and Haerle, J., concurred.

A petition for a rehearing was denied June 21, 1996, and the opinion was modified to read as printed above. The petition of appellant J & K Printing Co., Inc., for review by the Supreme Court was denied August 28, 1996.

[11]This disposition vacates the award of attorney fees and renders moot the parties' cross-contentions concerning the propriety of that award.

*Presiding Justice, Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.