Filed 8/14/17; Certified for Publication 9/6/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAN LUIS REY RACING, INC., Plaintiff and Appellant, v. CALIFORNIA HORSE RACING BOARD, Defendant and Respondent. | D069680 (Super. Ct. No. 37-2011-00096586- CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Katherine A. Bacal, Judge.  Affirmed.

Webb & Carey, Patrick D. Webb, and Kevin A. Carey for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Assistant Attorney General,

Christine Mersten, and Lindsey M. Stevens, Deputy Attorneys General, for Defendant

and Respondent.

San Luis Rey Racing, Inc. (SLRR) appeals from a judgment denying its petition

for a writ of mandate asking the superior court to overturn certain orders of the California

Horse Racing Board (CHRB) regarding the management of a fund established and governed by Business and Professions Code[1] sections 19607 and 19607.1. The superior court determined SLRR did not have standing because it did not have a direct interest in the disbursement of the fund and denied SLRR's petition. We agree SLRR does not have standing and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1990, the California legislature enacted legislation to address the increased costs associated with the need to provide off-site stabling for horses during race meetings due to rising horse populations exceeding the number of stalls available at a single race location. Section 19607 required satellite wagering facilities to redirect a small portion of the funds they would otherwise allocate for commissions, purses and owners' premiums into a fund (the fund), and created an organization comprised of race associations, fairs conducting racing, and the organization representing horsemen and horsewomen (collectively, the fund management organization[2]) to manage the fund. (Former § 19607,

---

[1]    All further statutory references are to the Business and Professions Code unless otherwise noted.

[2]    The parties dispute whether the Southern California Off Track Wagering, Inc. (SCOTWINC) or a smaller subset of SCOTWINC referred to as the Southern California Stabling and Vanning Committee carried out the management duties set forth in the statute. As used herein, "fund management organization" refers to the Southern California Stabling and Vanning Committee within SCOTWINC, consistent with the findings of the CHRB's Legislative, Legal and Regulations Committee (LLRC). Regardless, it would not affect our analysis regarding SLRR's standing if we determined SCOTWINC instead acted as the fund management organization.

added by Stats. 1990, ch. 131, § 15, eff. June 11, 1990, p. 33370, amended by Stats. 1998, ch. 516, § 1, p. 3635.)  Section 19607.1 directed the fund management organization to use the funds, in part, to reimburse race associations for the incremental increase in operating expenses associated with providing off-site stabling at board approved auxiliary training facilities during race meetings.  (Former § 19607.1, added by Stats. 1990, ch. 131, § 15, eff. June 11, 1990, p. 33370.)

At that time, SLRR operated an auxiliary facility and provided additional stabling for racehorses during race meetings but did not, itself, put on races, and thus was not a race association and did not contribute to the fund.  Prior to 2009, the fund management organization provided reimbursements from the fund for the use of auxiliary stalls at SLRR's facility, along with a number of other facilities.  By December 2009, though, horse racing revenues had decreased and the fund was operating at a deficit.  The fund management organization agreed to stop providing reimbursement for off-site stabling at SLRR and another auxiliary facility, while continuing to provide reimbursements for off-site stabling at just two facilities, Santa Anita and Hollywood Park, both of which conducted their own race meetings and provided off-site stabling for other venues during their off seasons.  SLRR disputed the CHRB's decision to do so and filed a grievance with the CHRB.

Unable to reach a resolution with the fund management organization or the CHRB, SLRR filed a complaint and petition for writ of mandamus with the superior court in early 2012.  In the complaint, SLRR asserted claims for unfair competition,

3

interference with contracts, and interference with prospective economic advantage, among others, based on allegations the fund management organization provided illegal subsidies to certain race associations, making it impossible for SLRR to compete for horse stalling business. SLRR also requested a writ directing the CHRB to exercise its jurisdiction to compel the fund management organization (referred to in the complaint as SCOTWINC) to comply with the statutory provisions governing the fund and to prohibit certain distributions from the fund.

The CHRB, along with other named defendants, filed various demurrers in response to SLRR's writ petition. The superior court granted the demurrers with respect to all claims asserted against the CHRB except for the writ petition. The court noted that certain racing associations had requested an audit of the fund, thereby invoking the board's primary jurisdiction to investigate and adjudicate the issue of whether the fund management organization had properly disbursed the funds in accordance with the law, and therefore stayed the remainder of the action in the interest of judicial efficiency. In making its ruling, the superior court noted SLRR had conceded it did not have standing to seek reimbursement from the fund, but that SLRR was not precluded from asserting other claims for damages, restitution or injunctive relief.

Upon completion of the audit, the CHRB appointed an independent referee, C. Scott Chaney, to make a determination as to two specific issues: " '(1) Whether the Stabling and Vanning Funds, distributed pursuant to Business and Professions Code section 19607 et seq., [had] been properly allocated and (2) [w]hether the Audit Report,

4

dated November 6, 2012, performed by the Audit Unit of the California Horse Racing Board, [was] in accordance with Business and Professions Code section 19433.' " Even though it was not a racing association with an interest in the audit, the CHRB permitted SLRR to participate in the meetings given SLRR's complaint in the superior court. After receiving briefing and materials from the parties and taking oral testimony from various witnesses, Referee Chaney issued a proposed decision to the CHRB on July 5, 2013.

Of relevance here, in the proposed decision Referee Chaney found the CHRB audit was conducted in accordance with the law, the statute required the fund management organization to reimburse the race associations for payments made to off-site facilities but the fund management organization had been directly reimbursing the facilities providing the off-site stabling instead, and the fund had been used for purposes other than stabling and vanning. With respect to the later finding, the proposed decision explained the fund management organization disbursed $600,000 from the fund in 2008 to pay for capital improvements at an auxiliary stabling facility and had also provided additional funds for medical services related to horse training. However, the decision noted the two improper disbursements were discovered in the audit and the CHRB had subsequently required the race associations to return the money to the fund.

Referee Chaney also determined the fund management organization did not use the funds in the most efficient manner, in part due to the circumvention of negotiations between individual race associations and stabling facilities that resulted from the direct reimbursement of off-site stabling facilities, and thus recommended additional oversight

5

by the CHRB.  In particular, Referee Chaney noted there was a general acceptance of overpaying for off-site stabling because race associations that acted as auxiliary facilities were generally willing to overpay to be overpaid in return.  As a result, auxiliary facilities like SLRR that did not also act as a race association did not receive reimbursements.  However, Referee Chaney acknowledged decisions for reimbursement could not be driven purely by economics and nothing in the law precluded the fund management organization from considering additional factors such as goodwill, service to the industry and minimizing disruptions in stabling.  Thus, he stated it was unclear how SLRR would have benefited had the fund management organization administered the fund in accordance with his interpretation of the governing statutes, although he also acknowledged that determination was outside the scope of his inquiry.

The CHRB held a board meeting on July 18, 2013, and adopted Referee Chaney's proposed decision.  Shortly thereafter, the respondents submitted an appeal and request for a temporary stay of the July 18 order and, on July 26, 2013, the CHRB issued the temporary stay.  A month later, on August 26, the CHRB dissolved the temporary stay and ordered that its previous order adopting the referee's proposed decision be filed with the superior court.  But, just a few days later on August 29, the assistant executive director of the CHRB issued another order at the direction of CHRB Commissioner Israel reinstating the previous stay and requesting the submission of written materials prior to the CHRB's October board meeting.

The next month, SLRR filed an ex parte request in the superior court, asking the court to lift its stay and to prohibit the CHRB from reconsidering its July 18, 2013 order. SLRR argued the CHRB's July 18 order was a final agency decision and the CHRB therefore no longer had jurisdiction to reconsider it. The court denied the request, noting Referee Chaney's proposed decision itself indicated it was limited in scope and was only a guide for the CHRB to utilize in making a determination as to the larger issues in the case. Thus, the court concluded there was support for the CHRB's assertion the July 18, 2013 order was not a final order. The court permitted SLRR to renew its request by way of a noticed motion, but SLRR did not file any further papers.

The CHRB referred the matter to the LLRC and, on April 24, 2014, the LLRC held a meeting to consider the issues raised by SLRR and the respondents. Although they had submitted a brief to the LLRC, SLRR did not attend the meeting. Following the meeting, the LLRC issued recommendations regarding Referee Chaney's proposed decision. The recommendations adopted certain portions of Referee Chaney's proposed decision, including the following findings: 1) the CHRB properly performed the audit; 2) the fund could be used for reimbursement of costs associated with additional off-site stalls a racing association determines are necessary for a race meeting; 3) the funds were used and distributed properly for the years of 2009, 2010, and 2011; and 4) no funds were improperly paid to Hollywood Park. The LLRC also made a number of its own additional findings, primarily concerning the makeup of the fund management

7

organization, none of which referred to SLRR.  On April 28, 2014, the CHRB issued an order adopting the recommendations of the LLRC.

Almost a full year later, in February 2015, SLRR filed an amended writ petition in the superior court, asking the court to direct the CHRB to void its orders dated August 29, 2013 and April 28, 2014, in addition to the relief sought in the original petition SLRR filed in 2012.  The superior court concluded SLRR did not have standing to pursue the writ petition because it had only an indirect interest in how the fund management organization disbursed the fund.  As such, the court denied SLRR's petition and entered judgment in favor of the CHRB.

SLRR filed a motion for a new trial, submitting additional evidence of its alleged contractual relationships regarding off-site stabling.  The superior court concluded SLRR had previously argued that it had a direct interest in the fund based on the alleged contracts, but that, regardless of the evidence, SLRR had only asserted an indirect interest, insufficient for standing, and denied the motion.

SLRR appeals.

## DISCUSSION

### I

### *STANDING*

#### A.  Standard of Review

The parties dispute whether this court should apply a de novo or substantial evidence standard of review in deciding whether the superior court erred in concluding

8

SLRR did not have standing. Both standing and the interpretation of statutes are questions of law to which we typically apply a de novo standard of review. (*Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 548-549; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799-801.) However, where the superior court makes underlying factual findings relevant to the question of standing, we defer to the superior court and review the findings for substantial evidence. (*Fry, supra*, at p. 549.)

Here, SLRR concedes it is not a race association and is not entitled to direct reimbursement under the statute. Thus, there are few, if any, underlying factual findings relevant to our inquiry and we address the legal question of whether SLRR has standing to dispute the CHRB's decisions and oversight of the fund de novo.

## B. SLRR Does Not Have Standing

To obtain relief based on a petition for a writ of mandamus under Code of Civil Procedure section 1085, the petitioner must be a beneficially interested party—one that has a direct and substantial interest in the action. (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1233 (*Waste Management*), disapproved on other grounds in *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 169-170 (*Save the Plastic Bag Coalition*).) In the present case, the superior court relied on *Waste Management* in determining that SLRR was not a beneficially interested party and thus did not have standing to pursue its writ petition. SLRR argues the court erred because it does have a direct interest sufficient to confer standing pursuant to *Waste Management* and, regardless, the California

9

Supreme Court disapproved of *Waste Management* on this ground in *Save the Plastic Bag Coalition*. As set forth more fully below, we agree with the superior court that *Waste Management* is instructive and disagree with SLRR that *Save the Plastic Bag Coalition* disapproved the court's analysis of beneficial interest standing in *Waste Management*.

### 1. *Waste Management is Instructive and SLRR Does Not Have a Sufficiently Direct Interest to Confer Standing*

In *Waste Management*, the county permitted Browning-Ferris, a competitor of Waste Management, to accept certain types of waste without requiring the same California Environmental Quality Act (CEQA) review it had required Waste Management to undergo before accepting the same type of waste. (*Waste Management, supra*, 79 Cal.App.4th at pp. 1230-1231.) Waste Management sought a writ of mandate directing the county to rescind the permit to Browning-Ferris and require a CEQA review before reissuing it. (*Id*. at pp. 1228, 1232.) The superior court issued the requested writ of mandate but the appellate court reversed, concluding Waste Management did not have standing because it did not have a direct interest in requiring Browning-Ferris undergo a CEQA review, its interest in the litigation was purely competitive, and the legislature had intended for CEQA to address environmental and not competitive concerns.[3] (*Id.* at

---

[3]    The court in *Waste Management* described Waste Management's interest as being outside the "zone of interests" of CEQA, a term it derived from federal law regarding standing despite recognizing federal law was not binding. The court concluded the "zone of interests" concept was nevertheless relevant in determining Waste Management's

10

pp. 1228-1229, 1235.)  More specifically, the court found Waste Management's only interest in pursuing the writ was forcing Browning-Ferris to incur additional costs associated with CEQA review—therefore leveling the competitive landscape as Waste Management had been forced to incur the cost of a CEQA review—and the court concluded that such a benefit was too indirect to support standing.  (*Ibid.*)

The court then went on to address whether Waste Management could nevertheless maintain standing as a citizen pursuing a public interest claim in a citizen's action. (*Waste Management, supra*, 79 Cal.App.4th at p. 1236.)  The court concluded Waste Management was a corporation and not a citizen and that it was therefore required to demonstrate the attributes of a citizen litigation, and set out several factors to consider in making that determination.  (*Id*. at pp. 1237-1238.)  The factors included whether the corporation demonstrated a continuing interest in the public right it was asserting, whether the entity had a separate interest it could not pursue through other means, and whether the asserted action would conflict with other legislative policies.  (*Id*. at p. 1238.) Applying this heightened standard, the court found Waste Management had not demonstrated an interest in or commitment to the environmental concerns it was raising, and thus determined Waste Management also did not have standing to maintain a citizen's action under the public interest exception to the directly beneficial interest standard.  (*Id.* at pp. 1238-1239.)

---

interest in forcing compliance with the statute was not direct enough to confer standing. (*Waste Management, supra*, 79 Cal.App.4th at pp. 1234-1235.)

11

Here, just as in *Waste Management, supra,* 79 Cal.App.4th 1223, SLRR's stated interest is competitive in nature:  SLRR essentially asserts it could not fairly compete for off-site stabling business because the fund management organization was improperly using funds to subsidize the cost of off-site stabling at competing facilities.  However, just as in *Waste Management*, there is no evidence or assertion here indicating the Legislature intended to address the competitive market for off-site stabling with the passage of sections 19607 and 19607.1.  Instead, the parties agree the legislation was created for the specific purpose of reimbursing race associations for the additional costs they incurred when horse populations grew, forcing them to utilize off-site stabling for race meetings.  Unfortunately for SLRR, when the horse populations subsequently decreased again, along with revenues, the fund management organization—comprised of representatives of the race associations and horsemen and women running races—limited reimbursements for off-site stabling at just two facilities, thereby discontinuing reimbursement for off-site stabling at SLRR.

SLRR concedes that it is not a race association conducting races and therefore the CHRB has never had any obligation under the statutes to reimburse SLRR from the fund, but contends it has a direct interest in competing for off-site stabling business.  However, no interpretation of the statutes, or any of the evidence before the superior court, indicates SLRR had a right to any portion of that business or that any race association had any obligation to use SLRR facilities.  At most, SLRR asserts the racing associations should have been free to contract with SLRR and to receive reimbursement from the fund for

12

their costs associated with off-site stabling at SLRR, but even under this interpretation, the race associations were equally free to choose facilities other than SLRR. Further, SLRR fails to acknowledge that the Legislature placed the responsibility for managing the fund in the hands of representatives of essentially the same groups that pay into the fund and decide where to go for off-site stabling, representatives of the race associations that host races and the horsemen and women that participate. (Former § 19607, added by Stats. 1990, ch. 131, § 15, eff. June 11, 1990, p. 33370, amended by Stats. 1998, ch. 516, § 1, p. 3635.) Thus, even if the fund management organization had not decided to limit reimbursements to two facilities, the race associations and horsemen and women were free to make that same choice and, moreover, were likely to do so based on the limited resources and built-in incentive to use the facilities of other race associations. SLRR's interest in competing for that business despite these additional factors is too remote and indirect to support standing.

SLRR asserts the race associations had a contractual obligation to use, and subsidize, a certain number of SLRR stalls, but the record does not support this contention. While SLRR may have had prior contracts with either the race associations or the managers of the fund to pay for the cost of off-site stabling for certain years, there are none in the record indicating any race association had agreed to use a certain number of stalls after 2009. Instead, SLRR points to the license applications and licenses between the race associations and the CHRB. Some of the license applications listed SLRR as having a certain number of stalls *available* for off-site stabling, but none of the

13

documents in the record *require* any race association, the CHRB or the fund management organization to use or pay for any particular number of SLRR stalls after 2009. Further, even if there was a contract mandating payment for the use or availability of stalls at SLRR after 2009, SLRR's remedy would be for breach of that contract and, notably, there is no such cause of action here.[4]

Moreover, even if the CHRB had accepted Referee Chaney's proposed decision instead of the recommendations of the LLRC—essentially the outcome SLRR is attempting to achieve through its writ petition—it is unlikely SLRR would have received any additional reimbursements from the fund. Referee Chaney found the audit of the fund was conducted in accordance with the law and, except for a couple of instances the CHRB had already rectified, the funds were used for the statutorily mandated purpose. Although Referee Chaney also determined the funds should have been distributed directly to the race associations instead of the off-site stabling facilities and that the fund was not used in the most efficient manner, he also correctly acknowledged SLRR might not have benefited had the fund management organization administered the fund in

---

[4]    SLRR also argues the inclusion of the descriptor "Board-approved" somehow confers a contractual right for all board approved auxiliary stabling facilities to receive reimbursements from the fund, but, taken in context, it is clear the statute creates no such contractual obligation. A straightforward reading of the statute indicates it permits use of the fund to reimburse *race associations* for their additional costs in procuring off-site stabling, and further requires the race associations to use only board approved facilities for such off-site stabling. It does not require race associations to use *all* board approved facilities, and SLRR provides no authority indicating that it does. Further, this position is in direct contradiction with SLRR's stated position that the race associations putting on races were free to use any facility of their choosing for off-site stabling under the statute.

14

accordance with his interpretation of the governing statutes. While stabling at an auxiliary site such as SLRR may have been more economical or geographically convenient, nothing in the statute precludes the race associations or the fund management organization from considering other factors, such as the ability of the race associations putting on races to remain open and continue offering races. (Former § 19607.1, added by Stats. 1990, ch. 131, § 15, eff. June 11, 1990, p. 33370.) As representatives of the race associations comprised the fund management committee, it is reasonably likely the individual race associations would have made a similar choice to limit off-site stabling to the facilities of other race associations putting on races, even absent any influence exerted by the organization. For the same reasons, we find SLRR's implication that Hollywood Park's president had some improper influence as a member of the fund management organization, and chairperson of SCOTWINC, unpersuasive.

Alternatively, SLRR argues it had beneficial interest standing pursuant to section 19607 because it had a direct interest in the CHRB directly and adequately supervising the fund management organization as mandated by the statute. However, SLRR's interest is the same regardless of whether we consider the CHRB's supervision of the fund mandated by section 19607 or the reimbursements the fund management organization made pursuant to section 19607.1. In either case, SLRR only has a direct interest if it stands to benefit directly from a revised application of the statutes and, as the statutes do not require the race associations to use SLRR for off-site stabling under any interpretation, SLRR does not stand to benefit directly from the requested writ.

15

### 2. *Save the Plastic Bag Coalition Is Not Instructive Because SLRR Does Not Assert Public Interest Standing*

SLRR argues *Save the Plastic Bag Coalition, supra,* 52 Cal.4th 155 is the controlling authority and that, there, the California Supreme Court disapproved the discussion of beneficial interest standing in *Waste Management, supra,* 79 Cal.App.4th 1223. However, SLRR misinterprets the discussion of *Waste Management* in *Save the Plastic Bag Coalition*.

In *Save the Plastic Bag Coalition*, the court considered whether an association of plastic bag manufacturers had standing to maintain a citizen's suit asserting the city was required to conduct an environmental impact report (EIR) on the effects of an ordinance banning plastic bags. (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at p. 160.) The city argued the coalition had failed to make the enhanced showing required by *Waste Management, supra,* 79 Cal.App.4th 1223 that public and not private economic interests motivated it, and that it should thus be " 'accorded the attributes of a citizen litigant' " in bringing a citizen suit. (*Save the Plastic Bag Coalition*, *supra,* at pp. 160, 167.) The court rejected this argument and the rule set forth in *Waste Management* subjecting private corporations to heightened scrutiny as compared with individual citizens when they assert public interest standing. (*Save the Plastic Bag Coalition, supra,* at pp. 167, 170.) Thus, the court found the coalition had public interest standing to pursue the citizen suit. (*Id*. at p. 170.)

In addition, the court also concluded the ban would have a direct, severe and immediate effect on the coalition members' ability to sell plastic bags in the city, and accordingly the coalition had standing based on a direct and substantial beneficial interest. (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at p. 170.) In making the latter determination, the court did not refer to *Waste Management, supra,* 79 Cal.App.4th 1223 or its discussion of beneficial interest standing. (*Save the Plastic Bag Coalition, supra*, at p. 170.) Thus, contrary to SLRR's assertion, the court did not disapprove of *Waste Management's* analysis of direct and substantial beneficial interest in *Save the Plastic Bag Coalition*, but instead disapproved only of its discussion of the right of a private corporation to assert public interest standing in a citizen suit. (*Save the Plastic Bag Coalition, supra*, at pp. 167, 170.)

Here, SLRR does not assert public interest standing, nor could it. As discussed, the statutes at issue created a mechanism and oversight for redistributing profits within the horse racing industry to address the increased cost of off-site stabling during races due to rising horse populations. They do not relate to or seek to protect a public interest such as the environmental concerns at issue in *Waste Management, supra,* 79 Cal.App.4th 1223 and *Save the Plastic Bag Coalition, supra,* 52 Cal.4th 155. Therefore, *Save the Plastic Bag Coalition's* discussion of public interest standing as a citizen is not applicable here.

Moreover, the discussion of beneficial interest standing in *Save the Plastic Bag Coalition, supra,* 52 Cal.4th 155 also does not alter our conclusion that SLRR lacks

17

standing based on a direct and beneficial interest. In *Save the Plastic Bag Coalition*, the city banned the use of plastic bags, thereby eliminating the market for plastic bags and directly and substantially effecting the business of the coalition members. To the contrary here, the CHRB did not ban the use of off-site stabling, or any other services, at SLRR's facilities; it simply decided the demand for such stabling during race meetings had decreased and it would only provide reimbursement to a more limited number of facilities. Although SLRR may have been in a less competitive position, like Waste Management, it was not banned outright from offering a product or service, like the Save the Plastic Bag Coalition members.

The other cases SLRR relies upon are similarly distinguishable. In *J&K Painting Co. Inc. v. Bradshaw* (1996) 45 Cal.App.4th 1394, a subcontractor had standing to pursue a writ requiring the state to release certain funds to a third party contractor, but there the state withheld the funds due to a purported labor law violation of the subcontractor, and the contractor had, therefore, withheld an equal sum from the subcontractor. Thus, the subcontractor had a direct interest in the state releasing the funds to the contractor, who was in turn contractually obligated to release the funds to the subcontractor. In *Doe v. Albany Unified School District* (2010) 190 Cal.App.4th 668, 683-684, the court held a child had a beneficial interest in a mandamus claim regarding the district's compliance with a statute regarding physical education because the child was deprived of a portion of the mandated biweekly minutes of physical education. Thus, in both cases, the petitioner was able to demonstrate an actual and concrete harm, a deprivation of funds or physical

18

education time, the requested writ would directly address. SLRR cannot point to a similar harm, or benefit, directly addressed by the writ it requests.

We therefore conclude the superior court correctly applied *Waste Management* and *Save the Plastic Bag Coalition, supra,* 52 Cal.4th 155 to determine SLRR has only an indirect competitive interest in the outcome of the writ and not a direct and beneficial interest sufficient to confer standing. (See *Waste Management, supra*, 79 Cal.App.4th at pp. 1228-1229.)

II

*SLRR WAIVED ARGUMENT BY FAILING TO FILE A*
*WRIT PETITION WITHIN 30 DAYS*

The CHRB also asserts that, even if SLRR had standing, SLRR waived its right to challenge any jurisdictional issues by failing to file a writ petition within 30 days of the disputed order. (See § 19463.) SLRR asserts the CHRB waived any argument regarding timeliness of the petition by failing to raise it below, but SLRR misrepresents the record; the CHRB did include affirmative defenses in its answer asserting the petition was an improper attempt at a rehearing and that the statute of limitations barred the petition. We therefore address the merits of the waiver argument and conclude that, if SLRR had standing, it still could not pursue its writ petition based on the statute of limitations.

Section 19463 requires a party to commence a legal action challenging any final administration action of the CHRB within 30 days of the board's action. (§ 19463; see *Capitol Racing LLC v. California Horse Racing Bd.* (2008) 161 Cal.App.4th 892, 900

19

[concluding § 19463 governs challenges to administrative orders of the CHRB].) Here, following a regularly noticed meeting, the CHRB issued a formal order adopting the recommendation of the LLRC. SLRR asserts the CHRB no longer had jurisdiction to issue the order but section 19463 required SLRR to file a petition, or another appropriate pleading, within 30 days of the April 28, 2016 order to make that argument in the superior court. SLRR did not challenge the final order of the board, or any of the intermittent orders leading up to that final order, until the following February, almost a full year later.

SLRR argues it was not subject to any statute of limitations because its petition asserted the CHRB, a state agency, took action without the authority to do so. SLRR relies exclusively on *Miller v. Board of Medical Quality Assurance* (1987) 193 Cal.App.3d 1371, 1373 to support this argument, but there the court found the 30-day statute of limitations *did* bar a physician's petition for writ of mandate. Thus, SLRR's assertions remain unsupported.

SLRR also asserts it was not subject to the 30-day time limitation because the superior court had ongoing jurisdiction based on its original petition for writ of mandamus. However, that petition was filed before the orders of the CHRB that SLRR now disputes and, as such, logically could not have included those orders. Moreover, the stay order issued by the superior court recognized the CHRB's primary jurisdiction to decide issues related to the use of the statutory funds and stayed the case in the interest of judicial efficiency, without reserving its own jurisdiction for the ongoing judicial review

20

of the CHRB's decision.  (Cf. *Morrison v. California Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 216 [trial court order on original writ petition expressly provided for judicial review of CHRB's decision after remand sufficient to confer ongoing jurisdiction, effectively tolling the 30-day limitations period].)  SLRR needed to file a secondary writ petition in a timely manner to dispute any further orders of the CHRB, and SLRR failed to do so.

Based on the foregoing, we conclude SLRR has not established the statute of limitations is not applicable in the present case, and, as SLRR filed the petition more than 30 days after the CHRB's order adopting the LLRC's recommendations, we agree SLRR's petition would be time barred even if SLRR had standing.

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:



McCONNELL, P. J.



O'ROURKE, J.


21

Filed 9/6/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN LUIS REY RACING, INC., | D069680 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00096586-CU-BT-CTL) |
| CALIFORNIA HORSE RACING BOARD, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed August 14, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the Defendant and Respondent's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties