Filed 7/14/11

# IN THE SUPREME COURT OF CALIFORNIA

SAVE THE PLASTIC BAG COALITION,  )
                                 )
         Plaintiff and Respondent,  )
                                 )         S180720
         v.                      )
                                 )         Ct.App. 2/5 B215788
CITY OF MANHATTAN BEACH,          )
                                 )         Los Angeles County
         Defendant and Appellant.  )      Super. Ct. No. BS116362
_____)

Here we consider two questions:  (1) What are the standing requirements for a corporate entity to challenge a determination on the preparation of an environmental impact report (EIR)?  (2) Was the city of Manhattan Beach required to prepare an EIR on the effects of an ordinance banning the use of plastic bags by local businesses?

Plaintiff, a coalition of plastic bag manufacturers and distributors, claims standing to maintain a citizen suit to vindicate the public interest in environmental quality.  The trial court and the Court of Appeal granted plaintiff standing on that basis.  Both courts rejected the city's argument that plaintiff had failed to make the enhanced showing required by *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1238 (*Waste Management*) for corporate entities to bring a citizen suit.  We agree that plaintiff would qualify for public interest standing here, and disapprove *Waste Management*'s holding that corporations are subject to heightened scrutiny when they file citizen suits.  We also conclude that plaintiff, which represents businesses directly affected by the

1

Manhattan Beach ordinance, has standing in its own right to challenge the city's analysis of environmental impacts.

On the merits, the courts below ruled that the city had to prepare an EIR before implementing a ban on plastic bags. We disagree. Substantial evidence and common sense support the city's determination that its ordinance would have no significant environmental effect. Therefore, a negative declaration was sufficient to comply with the requirements of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] Accordingly, we reverse the Court of Appeal's judgment.

## I. BACKGROUND

On June 3, 2008, the city manager of Manhattan Beach issued a staff report recommending the adoption of an ordinance banning the use of "point-of-sale plastic carry-out bags" in the city. The proposed ordinance included a finding that CEQA did not apply because the ban would have no significant effect on the environment (Cal. Code Regs., tit. 14, § 15061(b)(3)), and because it qualified as a regulatory program to protect the environment (*id*., § 15038).

Plaintiff, describing itself as "a newly formed group of companies that will be affected by any ordinance to ban or impose fees on plastic bags," objected to the proposed ordinance. [2] It claimed that the movement to ban plastic bags was

---

[1]    Further statutory references are to the Public Resources Code, unless otherwise noted. A "negative declaration" is "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.)

[2]    In its subsequent writ petition, plaintiff stated that it was "an unincorporated association" of "plastic bag manufacturers and distributors directly and indirectly affected and prejudiced by the Ordinance." Some of its members,

(*footnote continued on next page*)

2

based on misinformation and would increase the use of paper bags, with negative environmental consequences. Plaintiff notified the city that it would sue if the ordinance was passed without a full CEQA review.

The city then conducted an initial study evaluating the environmental impacts of the proposed ordinance. The study noted: "Reducing the use of plastic bags in Manhattan Beach will have only a modest positive impact on the migration of plastic refuse into the ocean. However, as a coastal City the imposition of the ban is likely to have some modest impact on improving water quality and removing a potential biohazard from the marine environment." The study recognized that a switch from plastic to paper bags would have some negative environmental consequences. More energy is needed to manufacture and distribute paper bags, and more wastewater is produced in their manufacture and recycling. However, the study concluded that the impacts of a plastic bag ban would be less than significant, for the following reasons:

"The population of Manhattan Beach is only 33,852 according to the 2000 census. However, per capita bag usage would provide an inflated measurement of any net increase in paper bag use since the proposed ordinance does not ban the use of plastic bags by residents but [rather] their distribution at point of sale. Only 11.2% of the City is zoned commercial and there are only 217 licensed retail establishments within the City which might use plastic bags. There are only two supermarkets, three (and two future) drug stores, and one Target store known to be high volume users of plastic shopping bags in the City which would be affected by

---

(*footnote continued from previous page*)

specifically including  three corporations, supplied plastic bags to businesses in Manhattan Beach.

the ban.  The remaining businesses tend to be smaller and lower volume and many restaurants and most fast food outlets already use paper bags for take out orders.

"Plastic bags would not be replaced by paper bags on a one to one ratio since paper bags have a higher capacity.  One study (commissioned by the plastic bag industry) estimates that for every 1500 plastic bags it would take 1000 paper bags to replace them.  Other studies find that paper bags may hold up to four times the volume of plastic bags.  In light of anticipated education efforts, increased publicity (partially resulting from the subject ordinance), and the public's increased concern for pollution and water quality, at least some percentage of plastic bags are expected to be replaced by reusable bags rather than paper bags."

The initial study observed that the ordinance would require paper bags "to have 40% recycled content reducing landfill demand and encouraging reduced use with increased costs for paper bags. . . .  The substitution of paper bags for plastic that does occur, although larger in mass per square foot compared to plastic, would not significantly impact landfill capacity since a larger portion of paper bags is recycled than plastic, substituted paper bags will be at least 40% paper diverted from landfills, and the City of Manhattan Beach represents a small proportion of regional landfill users."

Based on these considerations, the initial study concluded that any increase in the use of paper bags in Manhattan Beach would be relatively small, with minimal impacts on energy use, air quality, water quality, vehicle traffic, and solid waste facilities.  It noted that the ordinance posed no environmental threat to fish, wildlife, plant communities, historical resources, or human beings.  On the other hand, it would decrease the prevalence of plastic bag litter, both in the city itself and in the ocean.  Therefore, the study recommended adoption of a negative declaration finding that the ordinance could not have a significant effect on the environment.

Plaintiff again objected and threatened litigation if the ordinance was adopted. Plaintiff referred to two studies, one prepared in 2005 by the Scottish government and one issued in 2008 by the editors of an on-line newsletter, the Use Less Stuff (ULS) Report. Both concluded that the "life cycle" of paper bags, including their manufacture, transport, and disposal, has a greater environmental impact than the "life cycle" of plastic bags. Plaintiff contended this evidence established a reasonable possibility that increased use of paper bags as a result of the proposed ordinance would have a significant negative effect on the environment, requiring the preparation of a full EIR.

On July 1, 2008, the city issued another staff report addressing the "life cycle" studies. In addition to the Scottish and ULS studies, city staff had reviewed a Washington Post report; a 1990 study by Franklin Associates, Ltd.; an analysis conducted by the Fund for Research into Industrial Development, Growth and Equity; and a 2007 report by Boustead Consulting & Associates Ltd. The staff report also discussed a comparative analysis of bag "life cycle" studies prepared by the South African Department of Trade and Industry. The report noted that varying assumptions were employed from study to study, and that "differing results from the [studies] could be selectively used to lend support to proponents of either plastic or paper bags." The South African analysis had concluded that "life cycle" studies were "sensitive to and limited by factors such as scope, objectivity, geography, climate, and energy sources," and "can be constructed to carry a specific message by carefully selecting the impacts to examine." City staff recommended adopting the proposed ordinance, and embarking on "an aggressive education and outreach program to inform our residential and business community of the ban and to promote the use of reusable bags."

The Manhattan Beach City Council adopted ordinance No. 2115 on July 15, 2008. The council's findings are set forth in section 1 of the ordinance:

5

"A.  As a coastal city Manhattan Beach has a strong interest in protecting the marine environment an element which contributes to the unique quality of life in the City.

"B.  Plastic and paper bags each have negative impacts on the environment. It is well known that paper bags require more energy to manufacture and recycle and generate effluent during these processes.  It is also known that paper bags are bulkier and heavier than plastic bags.

"C.  However a primary and significant problem with plastic bags is that they do not biodegrade and are extremely light and easily caught in the wind.  In a coastal city like Manhattan Beach even plastic bags which are properly discarded can find their way into the marine environment where they do not break down and essentially remain indefinitely.

"D.  The Pacific Ocean contains a huge accumulation of debris known as the 'Great Pacific Garbage Patch' which consists mostly of plastic debris.  Some scientists estimate the density of plastic in this garbage patch as one million pieces of plastic per square mile.  While plastic does not bio-degrade it does 'photo-degrade' breaking down into smaller pieces which can make their way into the food chain [via] such animals as jellyfish.

"E.  While the exact numbers are unknown there are many reported instances of marine animals being injured or dying from ingesting or choking on plastic debris in the ocean.  It is reasonable to conclude from such information that the presence of plastic debris in the ocean provides a hazard for marine life.

"F.  Because there is a strong possibility that plastic bags discarded in Manhattan Beach can end up in the ocean where they will last indefinitely and create an aesthetic blight and potential hazard to marine life (and paper bags will not do so because they biodegrade and are less likely to be blown out to sea) it is in the best interests of the public health, safety and welfare to adopt the proposed

6

ban on distribution of plastic bags at point of sale within the boundaries of the City of Manhattan Beach.

"G. The City Council of the City of Manhattan Beach conducted a noticed public hearing regarding the project at their regular scheduled meeting of July 1, 2008. The public hearing was advertised pursuant to applicable law and testimony was invited and received.

"H. An Initial Environmental Study was prepared in compliance with the provisions of the California Environmental Quality Act. Based upon this study it was determined that the project is not an action involving any significant impacts upon the environment, and a Negative Declaration was prepared and is hereby adopted.

"I. The proposed amendments will have no negative impact on Fish and Game resources pursuant to Section 21089(b) of the Public Resources Code." (City of Manhattan Beach Ord. No. 2115, § 1.)

The ordinance provides: "No Affected Retail Establishment, Restaurant, Vendor or Non-Profit Vendor shall provide Plastic Carry-Out Bags to customers at the point of sale. Reusable Bags and Recyclable Paper Bags are allowed alternatives." (City of Manhattan Beach Ord. No. 2115, § 2(b)(A).) "Recyclable" is defined as: "material that can be sorted, cleansed, and reconstituted using Manhattan Beach's available recycling collection programs." (*Id*., § 2(a).) The ordinance also states: "Affected Retail Establishments are strongly encouraged to provide incentives for the use of Reusable Bags through education and through credits or rebates for customers that use Reusable Bags at the point of sale for the purpose of carrying away goods." (*Id*., § 2(b)(C).)

On August 12, 2008, plaintiff petitioned for a writ of mandate to bar enforcement of the ordinance until the city prepared an EIR. Plaintiff claimed that public rights were at stake, and that its "objective in bringing this action [was] that

7

of an interested citizen seeking to procure enforcement of . . . public duties." The city responded that plaintiff lacked standing to bring a citizen suit under *Waste Management*, *supra*, 79 Cal.App.4th 1223, because corporations are not "citizens" and plaintiff was seeking to advance the commercial and competitive interests of its members. The city also argued that plaintiff had failed to show that the ordinance would have any substantial impact on the environment.

The trial court granted the writ. It found that plaintiff had standing because it was not a "for-profit corporation that is seeking a commercial advantage over a specific competitor," and because it had raised a "genuine environmental issue: whether the banning of plastic bags, and the consequent increase in the use of paper bags, will increase, rather than decrease, injury to the environment." The court further concluded that the evidence in the record supported a fair argument that the ban would increase environmental damage, so that an EIR was required.

The Court of Appeal affirmed, in a split opinion. On the standing question, the majority decided that plaintiff was qualified to pursue its action under the "public right/public duty" exception to the requirement that a mandamus petition be brought by a "beneficially interested" party. (*Green v. Obledo* (1981) 29 Cal.3d 126, 145; Code Civ. Proc., § 1086.) The majority reasoned that plaintiff was not asserting a commercial or purely competitive interest, and should be allowed to seek enforcement of the city's public duty to prepare an EIR on the effects of the ordinance. On the merits, the majority held that plaintiff had submitted substantial evidence to support a fair argument that the ban would have significant environmental impacts.

The dissent did not address the standing issue, but argued that CEQA requirements would be stretched to the point of absurdity if a small city were required to prepare an EIR on the effects of increased paper use that might result from a ban on the distribution of plastic bags. The dissent concluded that the "life

8

cycle" studies on the global environmental effects of paper production did not provide substantial evidence of any environmental harm caused by the Manhattan Beach ordinance.

We granted the city's petition for review.

## II.  DISCUSSION

### A.  *Standing*

As a general rule, a party must be "beneficially interested" to seek a writ of mandate.  (Code Civ. Proc., § 1086.)  "The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.  [Citations.]  As Professor Davis states the rule: 'One who is in fact adversely affected by governmental action should have standing to challenge that action if it is judicially reviewable.'  (Davis, 3 Administrative Law Treatise (1958) p. 291.)"  (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796-797.)  The beneficial interest must be direct and substantial.  (*Parker v. Bowron* (1953) 40 Cal.2d 344, 351; *Braude v. City of Los Angeles* (1990) 226 Cal. App. 3d 83, 87; 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 75, p. 956.)

Nevertheless, " 'where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced.' "  (*Bd. of Soc. Welfare v. County of L.A.* (1945) 27 Cal.2d 98, 100-101.)  This " 'public right/public duty' exception to the requirement of beneficial interest for a writ of mandate" "promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the

9

purpose of legislation establishing a public right." (*Green v. Obledo*, *supra*, 29 Cal.3d at pp. 145, 144; see also *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.) We refer to this variety of standing as "public interest standing." (See *Dix v. Superior Court* (1991) 53 Cal.3d 442, 453.)

Here, plaintiff claims public interest standing to pursue its CEQA action. The city, relying on *Waste Management*, *supra,* 79 Cal.App.4th 1223, argues that plaintiff is not a "citizen" and has not demonstrated a genuine and continuing environmental concern sufficient to support public interest standing. In *Waste Management*, a landfill operator obtained a writ of mandate directing that permits issued to a competing operator be set aside and not reissued until the environmental effects of the competitor's operations were reviewed under CEQA. (*Waste Management*, *supra,* 79 Cal.App.4th at p. 1228.) The Court of Appeal reversed, concluding that the plaintiff lacked standing.

The *Waste Management* court first held that the plaintiff did not have the beneficial interest required for a writ of mandate because it asserted only a commercial and competitive interest. The plaintiff's grievance was that *it* had been required to undergo expensive CEQA review in a comparable permitting process, and would suffer economic injury if its competitor escaped such costs of compliance. The court ruled that this injury was not within the "zone of interests" protected by CEQA, and thus was too indirect to establish the requisite beneficial interest. (*Waste Management*, *supra*, 79 Cal.App.4th at p. 1235.)[3]

---

[3]     The *Waste Management* court first declared that an interest within the regulated zone is a second prong of the beneficial interest test. The court subsequently acknowledged that the "zone of interests" standard is a federal rule of standing, but suggested it is implicitly included within California's requirement

(*footnote continued on next page*)

10

The court then considered whether the plaintiff qualified for public interest standing. It observed that this exception to the beneficial interest requirement is meant to give citizens an opportunity to ensure the enforcement of public rights and duties. The plaintiff, however, was a corporation, and corporations are not generally regarded as "citizens." (*Waste Management*, *supra*, 79 Cal.App.4th at p. 1237.) Reasoning that corporations are typically motivated by corporate interests rather than the interests of citizenship, the court decided that when a corporation claims public interest standing it must "demonstrate it should be accorded the attributes of a citizen litigant." (*Id*. at p. 1238.) "[W]hen a nonhuman entity claims the right to pursue a citizen suit, the issue must be resolved in light of the particular circumstances presented, including the strength of the nexus between the artificial entity and human beings and the context in which the dispute arises." (*Ibid*.) The court suggested the following factors for consideration: whether the corporation has shown a continuing interest in or commitment to the public right

(*footnote continued from previous page*)

that the plaintiff's interest in enforcement must be a direct one. (*Waste Management*, *supra*, 79 Cal.App.4th at p. 1233-1234.) We have not adopted this federal standing doctrine for use in California courts. Its application in federal courts has not been entirely uniform. (Compare, e.g., *Nevada Land Action Assn. v. U.S. Forest Service* (9th Cir. 1993) 8 F.3d 713, 716 [plaintiff suffering only economic injury has no interest within "zone" protected by NEPA] with *Snoqualmie Indian Tribe v. FERC* (9th Cir. 2008) 545 F.3d 1207, 1216-1217 [party with direct economic interest in regulatory action is not subject to "zone of interest" requirement].)

We reiterate our recent admonition that "[t]here are sound reasons to be cautious in borrowing federal standing concepts, born of perceived constitutional necessity, and extending them to state court actions where no similar concerns apply." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal. 4th 310, 322, fn. 5; see also *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1020.)

11

being asserted; whether it represents individuals who would be beneficially interested in the action; whether individuals who are beneficially interested would find it difficult or impossible to seek vindication of their own rights; and whether prosecution of the action as a citizen suit by a corporation would conflict with other competing legislative policies. (*Ibid.*)

In the case before us, the Court of Appeal cited *Waste Management* but did not hold plaintiff to the special showing required by that decision. Though plaintiff is an association representing corporate entities, the court simply decided that plaintiff's interest was not purely commercial and competitive, observed that "maintaining a quality environment is a matter of statewide concern," and concluded that public interest standing was available to seek enforcement of the city's duty to prepare an EIR weighing the impacts of a ban on plastic bags.

We agree with the Court of Appeal that plaintiff's commercial interests were not an impediment to its standing here. Further, we approve the court's implicit rejection of the *Waste Management* rule holding corporations to a higher standard in qualifying for public interest standing. Only one other Court of Appeal has considered the details of the *Waste Management* factors when determining whether a corporation has standing to bring a citizen suit. (*Regency Outdoor Advertising, Inc. v. City of West Hollywood* (2007) 153 Cal.App.4th 825, 832-833.)[4] A more cursory approach was taken in *Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, a case like *Waste Management* that

---

[4]    In *Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, the *Waste Management* Court of Appeal held that if the *Waste Management* standards were applied to the instant corporate plaintiff, they would not support its claim of standing to bring a taxpayer action. (*Imagistics*, at pp. 593-594.)

involved competing waste disposal companies.  The *Burrtec* court reasoned that the plaintiff's corporate status did not affect its right to seek redress for the city's failure to provide the public notice required by CEQA before adopting a negative declaration for a competitor's conditional use permit.  (*Id.* at pp. 1138-1139.)  The court then summarily noted that the plaintiff was qualified to bring a citizen suit under the *Waste Management* criteria because it allegedly "encourage[d] and monitor[ed] environmental compliance, including CEQA determinations, by itself and other waste companies in Southern California."  (*Id.* at p. 1139.)

In other cases where corporate plaintiffs have asserted public interest standing, the Courts of Appeal have done what the court below did here:  referred to *Waste Management* but ignored the criteria it would impose on corporate entities.  (*Urban Habitat Program v. City of Pleasanton* (2008) 164 Cal.App.4th 1561, 1581 [nonprofit corporation had standing in citizen suit challenging housing regulations]; *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1252 [contractor's corporate status did not bar it from joining citizen suit].)  As these courts have recognized, the fact that a corporation is not technically a "citizen" for most purposes (see 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 1, p. 776) does not necessarily affect its standing to pursue a "citizen suit."

The term "citizen" in this context is descriptive, not prescriptive.  It reflects an understanding that the action is undertaken to further the public interest and is not limited to the plaintiff's private concerns.  Entities that are not technically "citizens" regularly bring citizen suits.  (E.g., *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439; *Urban Habitat Program v. City of Pleasanton*, *supra*, 164 Cal.App.4th at p. 1581; see 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 85, pp. 970-973, citing cases.)  Absent compelling policy reasons to the contrary, it would seem that corporate entities should be as

13

free as natural persons to litigate in the public interest. (See *Green v. Obledo*, *supra*, 29 Cal.3d at p. 145 [public interest exception "may be outweighed in a proper case by competing considerations of a more urgent nature"].)

The *Waste Management* court found such a policy reason in the notion that "it generally is to be expected that a corporation will act out of a concern for what is expedient for the attainment of corporate purposes (see *Marsili v. Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d 313, 322-325), rather than by virtue of the neutrality of citizenship (see *Carsten v. Psychology Examining Com.*, *supra*, 27 Cal. 3d at p. 799; *Laidlaw Environmental Services, Inc., Local Assessment Com. v. County of Kern* [(1996)] 44 Cal.App.4th [346,] 354)." (*Waste Management*, *supra*, 79 Cal.App.4th at p. 1238.) This presumption is overbroad. Corporate purposes are not necessarily antithetical to the public interest. Furthermore, the *Waste Management* restriction on public interest standing applies to all sorts of citizen suits by corporate entities, even those undertaken to enforce public rights and duties in areas where corporations have particular expertise and thus may have an enhanced understanding of the public interests at stake.

The *Carsten* court's reference to "the neutrality of citizenship" was a rhetorical flourish designed to highlight the fact that the plaintiff in that case was a member of an administrative board who disagreed with a board decision. Thus, her challenge to the decision was motivated by interests arising from her service on the board, rather than by broader public concerns. (*Carsten v. Psychology Examining Com.*, *supra*, 27 Cal.3d at p. 799; see also *Laidlaw Environmental Services, Inc., Local Assessment Com. v. County of Kern*, *supra*, 44 Cal.App.4th at p. 354 [members of local assessment committee lacked public interest standing to challenge decisions of agency that appointed them]; *Braude v. City of Los Angeles*, *supra*, 226 Cal.App.3d at p. 91 [city council member lacked public interest standing to raise CEQA challenge to council's approval of project].) *Carsten* did

not suggest that neutrality is a necessary prerequisite for public interest standing; indeed, truly neutral parties are unlikely to bring citizen suits. "The purpose of a standing requirement is to ensure that the courts will decide only actual controversies between parties with a sufficient interest in the subject matter of the dispute to press their case with vigor." (*Common Cause v. Board of Supervisors*, *supra*, 49 Cal.3d at p. 439, discussing public interest standing.)

The problem the *Waste Management* court sought to address with its sweeping limitation on corporate public interest standing was a discrete one: an attempt to use CEQA to impose regulatory burdens on a business competitor, with no demonstrable concern for protecting the environment. Such an attempt would be equally improper if launched by an individual. We disapprove *Waste Management of Alameda County, Inc. v. County of Alameda*, *supra*, 79 Cal.App.4th 1223, to the extent it held that corporate parties are routinely subject to heightened scrutiny when they assert public interest standing.[5]

We agree with the Court of Appeal that plaintiff's CEQA arguments were appropriate for a citizen suit. As we have noted, "strict rules of standing that might be appropriate in other contexts have no application where broad and long-

---

**5**    By disapproving *Waste Management* on this point, we do not suggest that public interest standing is freely available to business interests lacking a beneficial interest in the litigation. No party, individual or corporate, may proceed with a mandamus petition as a matter of right under the public interest exception. As the *Waste Management* court correctly observed, "Judicial recognition of citizen standing is an exception to, rather than repudiation of, the usual requirement of a beneficial interest. The policy underlying the exception may be outweighed by competing considerations of a more urgent nature. (*Green v. Obledo*, *supra*, 29 Cal.3d at p. 145; see also *Nowlin v. Department of Motor Vehicles* (1997) 53 Cal.App.4th 1529, 1538.)" (*Waste Management*, *supra*, 79 Cal.App.4th at p. 1237.)

15

term [environmental] effects are involved." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272.) We observe, however, that here it was unnecessary to resort to the public interest exception. Plaintiff plainly possesses the direct, substantial sort of beneficial interest required to seek a writ of mandate under Code of Civil Procedure section 1086. Its members include manufacturers and suppliers of plastic bags used by businesses in Manhattan Beach.[6] The ordinance's ban on plastic bags would have a severe and immediate effect on their business in the city. Clearly, they have a "particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten v. Psychology Examining Com.*, *supra*, 27 Cal.3d at p. 796.)

The city suggests that a plaintiff must be affected by a particular adverse *environmental* impact to qualify as a beneficially interested party in a CEQA suit. We have never so limited the scope of the beneficial interest requirement. It is not unusual for business interests whose operations are directly affected by a government project to raise a CEQA challenge to the government's environmental analysis. (E.g., *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565-567; *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 649, 652.) These are not citizen suits. Such parties are " 'in fact adversely affected by governmental action' " and have standing in their own right to challenge that action. (*Carsten v. Psychology Examining Com.*, *supra*, 27 Cal.3d at pp. 796-797.)

---

[6] The city does not dispute plaintiff's associational standing. (See *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361-362; *Brotherhood of Teamsters & Auto Truck Drivers v. Unemployment Ins. Appeals Bd.* (1987) 190 Cal. App. 3d 1515, 1521-1522.)

B.  *The EIR Requirement*

"[A] public agency pursuing or approving a project need not prepare an EIR unless the project may result in a 'significant effect on the environment' (§§ 21100, subd. (a), 21151, subd. (a)), defined as a 'substantial, or potentially substantial, adverse change in the environment' (§ 21068).  If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR.  (Cal. Code Regs., tit. 14, § 15064, subd. (f)(1); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75.)"  (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. omitted.) [7]  If, on the other hand,  "[t]here is no substantial evidence, in light of the whole record . . that the project may have a significant effect on the environment," the agency may adopt a negative declaration.  (§ 21080, subd. (c)(1); see also § 21082.2, subd. (a);  Cal. Code Regs., tit. 14, § 15064, subd. (f)(3); *Communities for a Better Environment v. South Coast Air Quality Management Dist.*, *supra*, 48 Cal.4th at p. 319.)[8]

---

[7]     The first step in CEQA analysis, of course, is whether the activity in question amounts to a "project."  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380.)  "A CEQA 'project' falls into one of three categories of 'activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' (§ 21065.)"  (*Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907.)  In this case, the ordinance is "[a] n activity directly undertaken by [a] public agency" under section 21065, subdivision (a).  The city has conceded at every stage of this litigation that the ordinance qualifies as a "project" for CEQA purposes.

[8]     Another alternative at this stage is to determine that the project is exempt from CEQA review.  Here, city staff suggested at first that the proposed ordinance would be exempt "under what is sometimes called the 'commonsense' exemption, which applies '[w]here it can be seen with certainty that there is no possibility that

(*footnote continued on next page*)

The city's decision to issue a negative declaration in connection with its plastic bag ordinance is reviewed for "prejudicial abuse of discretion," which "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; *Communities for a Better Environment v. South Coast Air Quality Management Dist.*, *supra*, 48 Cal.4th at p. 319.) The majority below concluded: "it can be fairly argued based on substantial evidence in light of the whole record that the plastic bag distribution ban *may* have a significant effect on the environment." The majority was satisfied from the various studies comparing the environmental impacts of paper and plastic bags that a plastic bag ban was likely to lead to increased use of paper bags, which have relatively greater negative environmental effects including "greater nonrenewable energy and water consumption, greenhouse gas emissions, solid waste production, and acid rain."

The majority conceded, "[i]t may be that the city's population and the number of its retail establishments using plastic bags is so small and public concern for the environment is so high that there will be little or no increased use of paper bags as a result of the ordinance and little or no impact on the environment affected by the ordinance." However, "the initial study contains no information about the city's actual experience — including, by way of example

---

(*footnote continued from previous page*)

the activity in question may have a significant effect on the environment' ([Cal. Code Regs., tit. 14,] § 15061, subd. (b)(3))." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 380.) However, once plaintiff raised objections to the ordinance, the city abandoned that idea and proceeded instead to conduct an initial study and issue a negative declaration. (See *Muzzy Ranch*, at pp. 380-381.)

only:  the number of plastic and paper bags consumed; recycling rates; the quantity of plastic bags disposed of in city trash; how the city disposes of its trash; whether plastic bags are a significant portion of litter found; how, when and in what quantities paper and plastic bags are delivered into the city; whether the city has a landfill that would be impacted by any increased paper bag use; whether there are recycling facilities or programs in the city or the surrounding area; and what the likely impact will be of a campaign urging recycling and reusable bag use."

On this record, it is undisputed that the manufacture, transportation, recycling, and landfill disposal of paper bags entail more negative environmental consequences than do the same aspects of the plastic bag "life cycle."  The city conceded as much in the initial study supporting its negative declaration.  CEQA, however, does not demand an exhaustive comparative analysis of *relative* environmental detriments for every alternative course of action.  It requires an EIR only for those aspects of a project likely to have *significant* environmental effects.  Section 21151, subdivision (b), governing local agency preparation of EIRs, specifies that "any significant effect on the environment *shall be limited to substantial, or potentially substantial, adverse changes* in physical conditions which exist within the area as defined in Section 21060.5."  (Italics added.) Section 21060.5 refers to "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance."

When we consider the actual scale of the environmental impacts that might follow from increased paper bag use in Manhattan Beach, instead of comparing the global impacts of paper and plastic bags, it is plain the city acted within its discretion when it determined that its ban on plastic bags would have no significant effect on the environment.

19

The only strictly local impacts of the ban appear to be those related to the transportation of paper bags, and possibly their disposal. It did not require a detailed study to conclude that the increased vehicle traffic and related effects stemming from the delivery of paper bags to Manhattan Beach businesses would be minimal. Nor was it necessary for the city to attempt a thorough analysis of the additional garbage that might result from the use of paper instead of plastic carry-out bags. While the Court of Appeal majority faulted the city for not providing information on whether it had a landfill that would be affected by increased paper bag use, the initial study noted that the city "represents a small proportion of regional landfill users." A reasonable inference is that solid waste from Manhattan Beach is taken to a regional landfill or landfills used by a variety of refuse sources in the surrounding area. The city properly anticipated that there would be no increase from those establishments already using paper bags, that some consumers would switch from plastic to reusable bags, that some would recycle their paper bags,[9] and that the number of Manhattan Beach consumers is small enough that the increase in the regional solid waste stream caused by discarded paper bags would be insignificant.

The other environmental impacts reflected in the record are those that might be felt beyond Manhattan Beach, as a result of processes associated with the manufacture, distribution, and recycling of paper bags in general. We have noted that the area defined by section 21060.5, that is, the area that will be affected by a proposed project, may be greater than the area encompassed by the project itself.

---

[9]     In addition to banning plastic bags, Ordinance No. 2115 requires all paper bags provided by establishments in the city to be recyclable "using Manhattan Beach's available recycling collection programs."

20

" '[T]he project area does not define the relevant environment for purposes of CEQA when a project's environmental effects will be felt outside the project area.' [Citation.]  Indeed, 'the purpose of CEQA would be undermined if the appropriate governmental agencies went forward without an awareness of the effects a project will have on areas outside of the boundaries of the project area.' [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 387.)

This does not mean, however, that an agency is required to conduct an exhaustive analysis of all conceivable impacts a project may have in areas outside its geographical boundaries.  " '[T]hat the effects will be felt outside of the project area . . . is one of the factors that determines the amount of detail required in any discussion.  Less detail, for example, would be required where those effects are more indirect than effects felt within the project area, or where it [would] be difficult to predict them with any accuracy." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 388.)  In *Muzzy Ranch*, we were concerned with the level of detail required to apply the commonsense exemption from CEQA review.  However, our comments are equally pertinent to the analysis of impacts in an initial study leading to the issuance of a negative declaration. "Evidence appropriate to the CEQA stage in issue is all that is required." (*Ibid*.)

The impacts of this project in areas outside Manhattan Beach itself are both indirect and difficult to predict.  The actual increase in paper bag use as a result of the ordinance is necessarily uncertain, given that some percentage of local residents may be expected to turn to the city's favored alternative, reusable bags.  Moreover, the city could hardly be expected to trace the provenance of all paper bags that might be purchased by Manhattan Beach establishments, in order to evaluate the particular impacts resulting from their manufacture.  Accordingly, under the approach we endorsed in *Muzzy Ranch Co. v. Solano County Airport*

21

*Land Use Com.*, *supra*, 41 Cal.4th at p. 388, the city could evaluate the broader environmental impacts of the ordinance at a reasonably high level of generality.

The city properly concluded that a ban on plastic bags in Manhattan Beach would have only a minuscule contributive effect on the broader environmental impacts detailed in the paper bag "life cycle" studies relied on by plaintiff. Given the size of the city's population (well under 40,000) and retail sector (under 220 establishments, most of them small), the increase in paper bag production following a local change from plastic to paper bags can only be described as insubstantial.

As the city conceded at oral argument, the analysis would be different for a ban on plastic bags by a larger governmental body, which might precipitate a significant increase in paper bag consumption. In the courts below, plaintiff referred to the cumulative impacts the Manhattan Beach ordinance might have in conjunction with similar laws enacted or contemplated elsewhere, including bans in San Francisco and Santa Monica, and possible bans in Oakland, Los Angeles County, and even statewide. (See § 21083, subd. (b)(2); *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at pp. 524-525; *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 700-702.) The Court of Appeal did not discuss this issue. In any event, we note that Manhattan Beach is small enough that even the cumulative effects of its ordinance would be negligible.[10]

---

[10]   For instance, plaintiff pointed out in its trial court briefing that Los Angeles County had an estimated population in 2006 of close to 10 million. It would be pointless to require the city to prepare an EIR on the additional impacts of paper bag use by its fewer than 40,000 residents, and ridiculous to ask it to evaluate the effects of a possible countywide ban before acting locally. While cumulative impacts should not be allowed to escape review when they arise from a series of

(*footnote continued on next page*)

In sum, the Court of Appeal erred by concluding there was substantial evidence to support a fair argument that Manhattan Beach's plastic bag ordinance might significantly affect the environment. While some increase in the use of paper bags is foreseeable, and the production and disposal of paper products is generally associated with a variety of negative environmental impacts, no evidence suggests that paper bag use by Manhattan Beach consumers in the wake of a plastic bag ban would contribute to those impacts in any significant way.

It is well settled that "CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) As noted above, it is also established that CEQA review includes the impacts a project may have in areas outside the boundaries of the project itself. However, this case serves as a cautionary example of overreliance on generic studies of "life cycle" impacts associated with a particular product. Such studies, when properly conducted, may well be a useful guide for the decisionmaker when a project entails substantial production or consumption of the product. When, however, increased use of the product is an indirect and uncertain consequence, and especially when the scale of the project is such that the increase is plainly insignificant, the product "life cycle" must be kept in proper perspective and not allowed to swamp the evaluation of actual impacts attributable to the project at hand.

_____

(*footnote continued from previous page*)

small-scale projects, that prospect does not appear in this case. According to plaintiff, the movement to ban plastic bags is a broad one, active at levels of government where an appropriately comprehensive environmental review will be required.

Common sense in the CEQA domain is not restricted to the exemption provided by the regulatory guideline discussed in *Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 380.  It is an important consideration at all levels of CEQA review.  (See, e.g., *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 272; *Martin v. City and County of San Francisco* (2005) 135 Cal.App.4th 392, 402, citing cases.)  Here, common sense leads us to the conclusion that the environmental impacts discernible from the "life cycles" of plastic and paper bags are not significantly implicated by a plastic bag ban in Manhattan Beach.

DISPOSITION

We reverse the judgment of the Court of Appeal.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**CROSKEY, J.  \***

_____
\*        Associate Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Save the Plastic Bag Coalition v. City of Manhattan Beach
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 181 Cal.App.4th 521
**Rehearing Granted**

_____

**Opinion No.** S180720
**Date Filed:** July 14, 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** David P. Yaffe

_____

**Counsel:**

Robert V. Wadden, Jr., City Attorney, for Defendant and Appellant.

John B. Murdock for Heal the Bay as Amicus Curiae on behalf of Defendant and Appellant.

Remy, Thomas, Moose and Manley, James G. Moose, Ashle T. Crocker and Jennifer S. Holman for Californians Against Waste as Amicus Curiae on behalf of Defendant and Appellant.

Briscoe Ivester & Bazel, Christian L. Marsh and Peter S. Prows for League of California Cities and California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

Carico Johnson Toomey and William G. Benz for The Manhattan Beach Residents Association as Amicus Curiae on behalf of Defendant and Appellant.

Stephen L. Joseph for Plaintiff and Respondent.

M. Reed Hopper and Joshua P. Thompson for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James G. Moose
Remy, Thomas, Moose and Manley
455 Capitol Mall, Suite 210
Sacramento, CA  95814
(916) 443-2745

Christian L. Marsh
Briscoe Ivester & Bazel
155 Sansome Street, Seventh Floor
San Francisco, CA  94104
(415) 402-2700

Stephen L. Joseph
350 Bay Street, Suite 100-328
San Francisco, CA  94133
(415) 577-6660