Filed 8/28/24  Barajas v. City of Petaluma CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| ADRIAN BARAJAS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF PETALUMA,<br><br>        Defendant and Respondent. | A165258<br><br><br>(Sonoma County<br>Super. Ct. No. SCV-265770) |

The Mitigation Fee Act (Gov. Code, § 66000 et seq.) (Act)[1] authorizes local agencies to impose fees on a specific development project to defray the cost of public facilities related to that project.  Section 66001, subdivision (d)(1) (section 66001(d)(1)) requires that an agency make certain "findings" every five years when these impact fees go unexpended.

In this action, plaintiff Adrian Barajas sought declaratory relief and a writ of mandate ordering defendant City of Petaluma (City) to refund all unexpended impact fees remaining in its accounts.  Barajas alleged, among other things, that City had failed to comply with section 66001(d)(1) because its five-year findings for the 2018 fiscal year were based on studies conducted before 2018.  The trial court rejected this argument, concluding that section 66001(d)(1) required City to make new *findings*, not new *studies*, and that

---

[1] Undesignated statutory citations herein are to the Government Code.

City's findings for the 2018 fiscal year were based on sufficient evidentiary support.  Barajas challenges these rulings on appeal.  We affirm.

## BACKGROUND

### I.    *The Act*

In 1987, the Legislature enacted the Act " 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' " (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 864.)  Although mostly "procedural in nature," the Act "embodies a statutory standard against which monetary exactions by local governments subject to its provisions are measured." (*Id.* at p. 865.)

Section 66001, subdivision (a) sets forth certain requirements for "establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency . . . ."  Among other things, the agency must determine how there is a "reasonable relationship" to the type of development project for both the use of the fee and the need for the public facility.  (*Id.*, subd. (a)(3)–(4).)  The Act "thus codifies, as the statutory standard applicable by definition to nonpossessory monetary exactions, the 'reasonable relationship' standard employed in California and elsewhere to measure the validity of required dedications of land (or fees imposed in lieu of such dedications) that are challenged under the Fifth and Fourteenth Amendments." (*Ehrlich v. City of Culver City, supra*, 12 Cal.4th at p. 865.)

Section 66001(d)(1) requires that "[f]or the fifth fiscal year following the first deposit into the account or fund, and every five years thereafter, the local agency shall make all of the following findings with respect to that portion of the account or fund remaining unexpended, whether committed or uncommitted . . . ."  The agency must (1) identify "the purpose to which the fee is to be put," (2) demonstrate a "reasonable relationship between the fee

2

and the purpose for which it is charged," (3) identify "all sources and amounts of funding anticipated to complete financing in incomplete improvements" for facilities identified when the fee was established/increased/imposed, and (4) designate "the approximate dates" on which such funding is expected to be deposited. (*Id.*, subd. (d)(1)(A)–(D).) If these five-year findings are not made as required, the agency "shall refund the moneys in the account or fund" to "the then current record owner or owners of the lots or units . . . ." (*Id.*, subds. (d)(2), (e).)

Section 66001, subdivision (d)(2) requires that five-year findings "shall be made in connection with the public information required by subdivision (b) of Section 66006." Section 66006, subdivision (b) identifies certain categories of information about impact fee accounts or funds, and requires that this information be made available to the public 180 days after the last day of each fiscal year.

## II.   *City's Five-year Findings*

The "entire focus" of Barajas's claim and this appeal is limited to the five-year findings made by City for the 2018 fiscal year. As of June 30, 2018 (the end of City's fiscal year), it had approximately $32 million in unexpended impact fee funds. City's annual development impact fee report (2018 report) described the purposes of these impact fees: to finance an aquatic center, community center, fire suppression facilities, library facilities, parklands, open spaces, law enforcement facilities, public facilities (e.g., city hall renovation or relocation), city facilities (i.e., facilities constructed by City), and traffic development.[2]

---

[2] Two additional impact fee funds related to storm drainage also had unexpended fees, but Barajas concedes these funds "are not subject to the refund rules" of the Act and he is "no longer pursuing refunds therefrom."

3

On February 25, 2019, City's council adopted a resolution making its five-year findings. The four findings stated:

"The purpose to which each fee is to be put is identified generally in Exhibit A of the Report, and more specifically in the City of Petaluma Mitigation Fee Report (Sinclair & Associates, May 8, 2008) and the Development Impact Fee Calculation and Nexus Report for the City of Petaluma, California and Master Facilities Plan for the City of Petaluma, California (both, Revenue & Cost Specialists, L.L.C., August, 2003), as well as the 'City of Petaluma Mitigation Fee Act Nexus Report and Quimby Act In-Lieu Report' prepared by Municipal Resource Group and the 'Traffic Mitigation Fee Program Update' prepared by Fehr & Peers (both, August, 2012) (collectively, the 'Nexus Studies'). Copies of the Nexus Studies are available for inspection at the offices of the City Clerk.

"There is a reasonable relationship between each fee and the purpose for which it is charged, as more fully set forth in and demonstrated by the Nexus Studies.

"The remainder of funds needed to construct the public improvements identified in the Nexus Studies related to each fee will be collected from future development impact fees through 2025, the life of the City of Petaluma General Plan 2025, and from other sources as identified in the Nexus Studies and the City's adopted Capital Improvement Program.

"Future sources and amounts of funding anticipated to complete the financing of specific future capital projects are identified and deposited into the appropriate account as part of the City's Capital Improvement Program budget cycle. No individual development impact fee fund has collected sufficient funds to construct all improvements covered by that fund as described in the Nexus Study."

The August 2003 "Development Impact Fee Calculation and Nexus Report for the City of Petaluma" (2003 report) identified the need for impact fees based on City's "continually expanding residential and business community," as well as City's "changing requirements for public safety,

4

streets and signals, storm drainage, and other quality of life facilities." It explained that a "component in determining the magnitude of impact of future development and the necessary facilities needed to mitigate that impact is a realistic assessment of the build-out population of the City." From the existing population in Petaluma of 54,548 persons, it calculated a potential build-out population of 65,794 by 2025. It noted that upcoming census information would "confirm or update" these figures.

The May 2008 "City of Petaluma Mitigation Fee Report" (2008 report) set out a development impact fee program that included nine of the ten fee categories identified in the 2018 report: aquatic center, community center, fire suppression facilities, library facilities, parklands, open spaces, law enforcement facilities, public facilities, and city facilities. It did not include traffic development impact fees. For the other fees, however, the report identified specific projects necessary to maintain the current level of service to residents and provide services for future residents. The fire suppression facilities impact fee, for example, listed relocation/construction and renovation of fire stations, additional vehicles, and additional firefighter equipment. The report also explained how these projects would "mitigate the additional impacts and demands" created by development projects. For example, the section on the fire suppression facilities impact fee stated that development would "generate new demands for fire suppression and emergency services" and the projects were necessary to maintain City's standard of 1 firefighter per 1,000 additional residents. The report used the existing population of 57,085 persons, with a build-out population of 72,707 by 2025.

The August 2012 "City of Petaluma Mitigation Fee Act Nexus Report & Quimby Act In-Lieu Fee Report" (2012 report) was conducted to determine

5

whether revisions to the development impact fee program were appropriate based on changes in "public facility requirements, construction costs and land costs" since 2008. It used the existing population of 58,165 persons, with the same build-out population of 72,707 by 2025. The report recommended various modifications to the impact fee categories described *ante*. For example, the section on the fire suppression facilities impact fee calculated slightly higher costs for the particular projects identified ($4,862,229 versus $4,767,845) attributable to future development. But many of the categories (e.g., parklands impact fees) included *lower* cost calculations. As a result, City decreased the amount of development impact fees it imposed.

The August 2012 "Traffic Mitigation Fee Program Update" (2012 traffic report) discussed updates to the traffic mitigation fee program adopted four years prior. It explained that the program was "intended to fully fund transportation improvements needed as a result of growth in the City." The report identified specific projects to relieve cross-town traffic attributable to new development, including street and lane extensions, highway interchange improvements, intersection improvements and constructions, as well as traffic signal updates, pedestrian/bicycle improvements, and public transit system improvements.

The capital improvement program adopted by City for fiscal year 2018–2019 (CIP) identified City's five-year plan for capital improvement projects, including improvements funded with impact fees as well as other sources. For example, the CIP stated that City would be completing its remodel of fire stations in fiscal year 2018–2019, using $98,000 from the fire suppression facilities impact fee fund and $236,000 from City's transient occupancy tax.

## III. *Barajas's Action*

This action was originally filed in December 2019. Barajas was added as a named plaintiff in the first amended complaint for declaratory relief and petition for writ of mandate. The second amended complaint and petition was filed in July 2020. The original plaintiff dismissed her claims in January 2021, leaving Barajas as the only named plaintiff.

Barajas alleged that the five-year findings made by City for the 2018 fiscal year violated the Act because they relied on nexus studies "more than five years past, not conducted in 2018." He alleged: "California law does not allow for reference to prior nexus studies to meet a current nexus study requirement." Barajas also alleged that these five-year findings were late because they were adopted on February 19, 2019, but had to be made "in accordance with" public information due on December 27, 2018 (180 days after the end of City's fiscal year on June 30th). (§§ 66001, subd. (d)(2), 66006, subd. (b)(1).)

Barajas sought declaratory relief that City breached its legal duties in failing to make the requisite five-year findings, and that it must cease further collection of impact fees and refund unexpended fees as invalid, void, and illegal. Barajas also sought a writ of mandate ordering City to refund "all unexpended Impact Fees remaining in [its] accounts" plus interest earned, including all fees collected *after* the December 27, 2018 deadline, and to cease collection of impact fees until City "makes and adopts the requisite 5-Year Findings . . . ."

City filed its opposition brief to the complaint and petition. As a preliminary matter, City argued that Barajas lacked standing to bring the action because the developer of his property only paid impact fees in September 2019—more than a year after the 2018 fiscal year for which City

7

made its five-year findings—and thus Barajas was not entitled to any refund of fees that were the subject of those findings. City then argued that section 66001(d)(1) did not require it to conduct new nexus studies in support of its five-year findings. City also argued that the purported two-month delay in its adoption of the findings did not require City to refund any of its impact fees.

The trial court held an initial hearing and then requested supplemental briefing from the parties. Among other things, it noted that Barajas had failed to "pinpoint" what City's five-year findings "actually said" or "exactly how they were deficient." The court directed Barajas to cite to specific portions of the record containing each finding and the related evidence.

The parties submitted additional briefing. Barajas clarified that "the only 5-Year Findings upon which relief is sought" were the "late-filed" and "fatally defective" findings for the 2018 fiscal year made on February 25, 2019. Barajas conceded that he did not challenge the sufficiency of the first finding (purpose of fee) required under section 66001(d)(1). On the second finding (reasonable relationship between fee and purpose), Barajas argued that the finding was "conclusory" and had "no current analysis whatsoever." He stated that the prior nexus studies could not be sufficient because they did not take current information, like the City's population, into account.

On the third finding (sources and amounts of funding to complete financing for incomplete improvements), Barajas argued that the CIP either played "no role" because it was not cited in the previous two findings or was only "partially helpful" because it detailed projects not financed by impact fees alone. On the fourth finding (approximate dates for deposit of such funding) is expected to be deposited, Barajas argued that the CIP did not provide such dates.

8

The trial court held another hearing and then denied the petition. On the issue of standing, it explained that the timing of the impact fee payment on Barajas's property (after City's five-year findings for the 2018 fiscal year) was "immaterial" because Barajas sought a refund of *all* unexpended impact fees in City's accounts. The court thus concluded that Barajas had standing "due to a potential right to a refund should his arguments prove persuasive . . . ."

Turning to the merits of those arguments, however, the trial court determined there was "no legal support" for Barajas's contention that section 66001(d)(1) required City to "make new detailed *studies* as opposed to new *findings*." Section 66001(d)(1) "does not state that the agency needs to do anything more than make those required findings." The City made those findings for the 2018 fiscal year, and thus the question was "whether the studies and information on which the findings . . . rely are informationally sufficient or proper basis for the findings." The court determined that City's prior studies, including the 2018 report and CIP, "contain much detailed information clearly covering all of the findings required." While acknowledging it was "possible" that older studies "*could* be outdated," the court concluded that Barajas had failed to show any support for such a contention here.

The trial court also concluded that City's two-month delay in making its findings for the 2018 fiscal year did not violate section 66001(d)(1) and did not "automatically trigger" a refund of unexpended impact fees. Judgment was entered in favor of City and against Barajas. This appeal followed.

## DISCUSSION

" 'A petition for traditional mandamus is appropriate in . . . actions brought to attack, review, set aside, or void a quasi-legislative . . . or

9

ministerial determination, or decision of a public agency.' " (*Beach & Bluff Conservancy v. City of Solano Beach* (2018) 28 Cal.App.5th 244, 258.) The parties agree that City's adoption of findings for the 2018 fiscal year was a quasi-legislative action. (*Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350, 1363–1364 (*Walker*) [five-year findings under § 66001, subd. (d)(1) constitute quasi-legislative action].)

" 'The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires.' " (*Beach & Bluff Conservancy v. City of Solano Beach, supra*, 28 Cal.App.5th at pp. 258–259.)

In this appeal, Barajas challenges both the trial court's legal determination that section 66001(d)(1) requires only new findings (not new studies) and its factual determination that City's findings for the 2018 fiscal year had sufficient evidentiary support. City responds that the trial court was correct in both respects but also renews its argument that Barajas lacked standing to bring the action altogether. We begin with standing.

## I.    *Standing*

"As a general rule, a party must be 'beneficially interested' to seek a writ of mandate." (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165 (*Save the Plastic Bag Coalition*), quoting Code Civ. Proc., § 1086.) The petitioner bears the burden to demonstrate this beneficial interest, and must show either some benefit "could accrue to him if the writ were issued" or some detriment would be suffered by him if it were denied. (*Parker v. Bowron* (1953) 40 Cal.2d 344, 352.) In other words, the

10

"beneficially interested" requirement " 'has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Save the Plastic Bag Coalition*, at p. 165.) The beneficial interest must be both "direct" and "substantial." (*Ibid.*)

Here, City argues that Barajas lacked standing to pursue this action because impact fees for his property were not paid until September 2019, more than a year after City's 2018 fiscal year ended and seven months after City adopted its five-year findings. City contends that Barajas was not " 'beneficially interested' " in the outcome of the writ because he would not be entitled to receive any refund of monies that were in the City's accounts at the end of the 2018 fiscal year.

This argument does not account for the scope of Barajas's claims and relief requested therein. Barajas sought a writ of mandate ordering City to refund "all unexpended Impact Fees remaining in [its] accounts" including all fees collected *after* the end of the 2018 fiscal year. Barajas argued that this refund was required under section 66001 because City's failure to make the requisite five-year findings mandated a refund of "the moneys in the account or fund" to "the then current record owner or owners of the lots or units . . . ." (*Id.*, subds. (d)(2), (e).) Accordingly, Barajas would have accrued a "direct" and "substantial" benefit if the trial court had granted this relief: He would have received a portion of the refund. (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at p. 165.) We thus conclude Barajas had a beneficial interest sufficient to confer standing to pursue this action.[3]

---

[3] Given this conclusion, we need not address the parties' arguments regarding alternative bases for standing, including "public interest" standing,

## II. *Section 66001(d)(1) Findings*

We turn to the trial court's legal determination that section 66001(d)(1) did not require City to conduct new studies to support its five-year findings. "We review de novo any challenge based on an interpretation of the Act's requirements." (*Walker, supra*, 239 Cal.App.4th at p. 1363.)

In interpreting section 66001(d)(1), " ' "our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232.) The process "may involve up to three steps." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) First, we begin with the words of the statute themselves as "chosen language is the most reliable indicator of its intent . . . ." (*Ibid.*) "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (*Id.* at p. 1083.) When the plain meaning of the text does not resolve the question, we proceed to the second step and turn to maxims of construction and extrinsic aids, including legislative history materials. (*Ibid.*) If ambiguity remains, we "must cautiously take the third and final step" and "apply 'reason, practicality, and common sense to the language at hand.' " (*Id.* at p. 1084.)

The plain language of section 66001(d)(1) is clear and unambiguous: It requires only that an agency make certain "findings" with respect to the unexpended portion of an impact fee account or fund. It does not specify any particular evidentiary support needed to make those findings, let alone that new studies must be conducted every time the findings are required. We see

---

taxpayer standing under Civil Code section 526a, and the "continuous accrual doctrine" discussed in *County of El Dorado v. Superior Court* (2019) 42 Cal.App.5th 620, 627.

12

nothing in the text of section 66001(d)(1) that obligated City to conduct studies in 2018 to support its five-year findings for the 2018 fiscal year.

Even if the statutory language were ambiguous, the legislative history of section 66001(d)(1) would support this interpretation. When enacted in 1987, the Act contained a requirement that an agency make findings "with respect to any portion of the fee remaining unexpended or uncommitted in its account five or more years after deposit of the fee to identify the purpose to which the fee is to be put and to demonstrate a reasonable relationship between the fee and the purpose for which it was charged." (Stats. 1987, ch. 927, § 1, p. 3132.)[4] In other words, the original text included a similar requirement that an agency make findings related to impact fees still remaining after five years, albeit specifying only two of the four particular findings now required by section 66001(d)(1).

The Legislative Counsel's Digest stated that these findings would require an agency to "reexamine the necessity for the unexpended balance of the fee, as specified, every 5 years[.]" (Legis. Counsel's Dig., Assem. Bill No. 1600 (1987–1988 Reg. Sess.) 4 Stats. 1987, Summary Dig., pp. 301–302.) But we reject Barajas's repeated contention that this term "reexamine" shows an intent by the Legislature to require that new studies be conducted to support the findings. On the contrary, committee bill analysis shows that the Legislature contemplated "<u>local flexibility</u>" in meeting the requirements.

---

[4] We grant the request by amici curiae California Special Districts Association, California State Association of Counties, and League of California Cities to take judicial notice of legislative history materials for Assembly Bill No. 1600 (1987–1988 Reg. Sess.), which adopted the Act. (Evid. Code, § 452, subd. (d); *People v. Superior Court (Ferguson)* (2005) 132 Cal.App.4th 1525, 1532 [Legislative Counsel digests, legislative committee reports and analyses, and prior bill versions are properly the subject of judicial notice].)

(Sen. Local Government Com., Analysis of Assem. Bill No. 1600 (1987–1988 Reg. Sess.), as introduced July 1, 1987, p. 2 (1987 Analysis).) It explained that the Act "directs local agencies to meet these new fee requirements without specifying the manner in which, *or the basis upon which*, these requirements must be met." (*Ibid.*, italics added.)

Finally, we note that the recent addition of section 66016.5 to the Act is consistent with our view on section 66001(d)(1). While subsequent legislative history is ordinarily "given little weight," it is " 'sometimes considered relevant' " to clarify the Legislature's intent regarding an earlier enacted statute. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 54, fn. 17; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589, fn. 13 ["While the concept of 'subsequent legislative history' may seem oxymoronic, it is well established that 'the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them' "].)

Section 66016.5 added specific "standards and practices" for impact fee nexus studies and now requires, as of January 1, 2022, that such studies "be updated at least every eight years." (Stats. 2021, ch. 347, § 2.) The bill was introduced following a report released by the Department of Housing and Community Development which "stressed the need for additional guidance on how local jurisdictions conduct nexus studies, which are currently governed by an opaque and informal patchwork of guidelines and common practices." (Assem. Com. on Housing and Community Development, Analysis of Assem. Bill No. 602 (2021–2022 Reg. Sess.), as amended Apr. 19, 2021, p. 2.) Bill analysis made clear that these were "new" requirements that would "add more rigor to the process for preparing and adopting impact fee nexus studies." (*Id.* at pp. 1, 4.) They were not a clarification of any existing

14

obligations to update nexus studies within a particular time frame. The plain language and legislative history of section 66001(d)(1) make clear that City was only required to make new findings, not new studies, for the 2018 fiscal year.

We are not persuaded by Barajas's argument that *Walker* commands otherwise. In that case, the city of San Clemente imposed impact fees for beach parking based on anticipated inland development. (*Walker, supra*, 239 Cal.App.4th at p. 1356.) From 1989 to 2009, the city collected almost $10 million in beach parking impact fees but spent less than $350,000 to purchase a vacant parcel and did not construct any parking facilities on the parcel. (*Ibid.*) The plaintiffs sought a refund of unused fees, arguing that the city failed to make sufficient five-year findings and the purported need for the fees (increased parking demand) had not materialized. (*Id.* at pp. 1356–1357.)

Before the fee was established in 1989, the city studied the proposed developments and concluded that the developments would require additional parking spaces. (*Walker, supra*, 239 Cal.App.4th at p. 1360.) By 1995, newer studies determined that parking needs could be satisfied with existing facilities. (*Ibid.*) The fee was reduced and used to finance broader parking improvements. (*Ibid.*) Additional studies were conducted into the 2000's that also recognized the city had adequate beach parking. (*Id.* at p. 1361.) In 2009, the city attempted to make five-year findings when it " 'receive[d] and file[d]' " a staff report. (*Ibid.*)

The appellate court concluded that the city had violated section 66001(d)(1). (*Walker, supra*, 239 Cal.App.4th at p. 1363.) For its finding to demonstrate a reasonable relationship between the unexpended fees and the purpose for which the fee was originally charged, the city's report stated:

15

" 'New parking facility improvements are determined by the City Engineering department and cost estimates established.' " (*Id.* at p. 1364.) The city argued that it was not required to provide any more detail because "nothing of any significance had changed" since 1989. (*Id.* at p. 1366.) The appellate court disagreed, concluding that the city "may not rely on findings it made 20 years earlier to justify the original establishment of the Beach Parking Impact Fee, or the findings it made 13 years earlier to justify reducing the amount of the fee" but, instead, must "make new findings demonstrating a continuing need for beach parking improvements caused by the new development in the noncoastal zone." (*Ibid.*)

As a preliminary matter, *Walker* is easily distinguishable on its facts. The purported findings in *Walker* did not appear to follow the language required by section 66001(d)(1). On the second finding (reasonable relationship between fee and purpose for which it was charged), for example, San Clemente tried to rely on a statement that improvements were "determined" by its engineering department. (*Walker, supra*, 239 Cal.App.4th at p. 1364.) Here, unlike *Walker*, City's four findings tracked the section 66001(d)(1) language and explicitly cited to nexus studies and the CIP that, as described *ante*, contained evidentiary support for the findings. *Walker* is also distinguishable on its facts because San Clemente tried to rely on older findings from 1989 and 1996 to argue it had satisfied section 66001(d)(1) despite intervening studies that plainly refuted the need for additional parking found in the older studies. (*Walker, supra*, 239 Cal.App.4th at p. 1366.) Here, Barajas has not identified anything in the substance of the nexus studies that made City's reliance on them improper.

More importantly, we see nothing in *Walker* to support Barajas's position that an agency can *never* rely on studies made in prior years as

16

evidentiary support for its findings under section 66001(d)(1). *Walker* simply concluded that old findings were insufficient because section 66001(d)(1) required "new" findings. (*Walker, supra*, 239 Cal.App.4th at p. 1366.) City did that here, adopting new findings for the 2018 fiscal year. *Walker* reasoned that new findings were required because they demonstrate a "continuing need" for the improvements. (*Ibid.*) Such a demonstration may not be satisfied by outdated evidence (e.g., prior findings long since refuted), but *Walker* did not categorically preclude reliance on evidence from prior years to support new findings being made.

In sum, we conclude the trial court did not err in determining that section 66001(d)(1) did not require City to conduct new studies to support its new five-year findings for the 2018 fiscal year.

## III. *Sufficiency of City's Five-year Findings*

We turn next to the trial court's factual determination that City's five-year findings made for the 2018 fiscal year were based on sufficient evidentiary support. We review this determination for substantial evidence and "are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' " to support the determination below. (*Walker, supra*, 239 Cal.App.4th at p. 1363; *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup*, at p. 660.) Barajas bears the burden to demonstrate that there is insufficient evidence to sustain the court's ruling. (*Foreman Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

17

Barajas concedes that he is not challenging the determination regarding the first of City's four section 66001(d)(1) findings: the purpose to which the fee is to be put. We thus turn to his arguments related to the three remaining findings.

A. *Section 66001(d)(1)(B)–(D) Findings in General*

Barajas appears to argue for the first time in his reply brief that City failed to make " 'specific' " findings for each of the impact fees, instead adopting one set of general findings. An appellant forfeits an issue by failing to raise it below or in its opening appellate brief. (*Dumas v. Los Angeles County Bd. of Supervisors* (2020) 45 Cal.App.5th 348, 356, fn. 5 (*Dumas*).) Even if not forfeited, we are not persuaded that section 66001(d)(1) requires a separate finding for each individual fee. The plain language of the provision requires only that an agency make "findings," and the legislative history confirms this requirement was imposed "without specifying the manner in which" it would be met. (1987 Analysis, *supra*, at p. 2.) Barajas points to an excerpt in *Walker* that an agency must "specifically demonstrate" the reasonable relationship on its second finding, but we read this excerpt to simply confirm that such findings have some specific evidentiary support. (*Walker, supra*, 239 Cal.App.4th at p. 1370.)

B. *Section 66001(d)(1)(B) Finding*

Barajas argues that City's second finding is "conclusory" as it does not itself include a " 'demonstration' " of the reasonable relationship. To the contrary, the finding states that the reasonable relationship is "more fully set forth in and demonstrated by the Nexus Studies," including evidence contained in the 2008 and 2012 reports, as well as the 2012 traffic report.[5]

---

[5] We do not consider any information included in City's 2008 traffic report, 2011 staff review, 2016 traffic report, or parkland reports referenced

We conclude that the finding is sufficient because these reports describe the reasonableness of fees for improvements that were also included in the 2018 report. For example, the 2018 report referenced traffic impact fees related to the Rainier Avenue cross-town connector. The 2012 traffic report stated that improvements to Rainier Avenue "would relieve some of the future traffic growth" on other roads by providing an additional crossing.

Barajas argues next that the 2008 report and 2012 traffic report cannot be used to substantiate City's findings because after those reports were issued, some of the impact fees were consolidated into one fund and new funds were created for other fees. But again, the 2008 and 2012 reports describe fees and improvements that were also included in the 2018 report, regardless of how fee funds were created or consolidated in the intervening period. We do not see these fund adjustments as a basis to preclude City from relying on prior evidence.

Even assuming this evidence could be used to support City's findings, Barajas argues that the 2008 report and 2012 traffic report were flawed because they were based on "overstated" projections about population growth. While Barajas did argue to the trial court that reliance on prior studies was inappropriate because it failed to account for current population figures, he has not provided any citation to the record showing these specific arguments about the 2008 and 2012 projections were raised below. (*Dumas, supra*, 45 Cal.App.5th at p. 356, fn. 5.) Even if he had, we see no merit in his complaint that the build-out population projection in the 2008 report (72,707) contained an "unexplained increase" from the projection in the 2003 report (65,794). City's findings did not rely on the 2003 report, which was explicit

---

in the respondent's brief. We agree with Barajas that these reports are irrelevant because they were not referenced in City's five-year findings.

that subsequent data may "confirm or update" its projection. Barajas offers nothing to show that the 2008 projection was based on some actual error, or that it was an error of such magnitude that it invalidated analysis regarding the reasonable relationship between impact fees and their purposes contained in the report. Barajas also contends that the 2012 traffic report projected population growth despite the "de minimis" growth that occurred from 2007 to 2012.[6] Again, Barajas does not show that higher growth projections in the 2010's were in fact untenable, particularly given the economic downturn of the late 2000's discussed in City materials. We thus conclude that City's finding under section 66001, subdivision (d)(1)(B) was supported by sufficient evidence.

C. *Section 66001(d)(1)(C)–(D) Findings*

City's third finding stated that the "remainder of funds needed to construct the public improvements identified in the Nexus Studies related to each fee will be collected from future development impact fees through 2025" and "other sources as identified in the Nexus Studies and the City's adopted Capital Improvement Program." Its fourth finding stated that future "sources and amounts of funding anticipated to complete the financing of specific future capital projects are identified and deposited into the appropriate account as part of the City's [CIP] budget cycle" and "[n]o individual development impact fee fund has collected sufficient funds to

---

[6] We grant Barajas's request for judicial notice of 2010 census data for Petaluma. (Evid. Code, § 452, subd. (h).) We deny the request for judicial notice of 2020 census data, as it is not necessary or helpful to our analysis of evidence relied upon in 2018. (Cal. Rules of Court, rule 8.252; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

construct all improvements covered by that fund as described in the Nexus Study."

Barajas again objects to any reliance on studies conducted before 2018, which we reject for the reasons detailed *ante*. Further, these studies contained information regarding funding sources, amounts, and dates for facilities identified when the fee was imposed. In the 2012 report, for example, the fire suppression facilities section estimated that the refurbishing of two fire stations would cost $6,344,000 and that $1,338,584 was assigned to the impact fee program. It set an impact fee of $5,399 to be imposed to fund this project (as well as the other city facilities fee projects). Barajas makes no specific argument that the funding sources or amounts indicated in these studies are wrong.

As for its reliance on the CIP, Barajas argues for the first time in his reply brief that a CIP cannot be used to support section 66001(d) findings "as a [m]atter of [l]aw." (Boldface omitted.) The argument is forfeited and, in any event, unpersuasive. (*Dumas, supra*, 45 Cal.App.5th at p. 356, fn. 5.) Barajas points to section 66001, subdivision (a)(2), which states that an agency "may, but need not," reference a CIP in identifying public facilities for which a fee is charged. Barajas contends that the failure to also reference CIP's in section 66001(d)(1) means they cannot be relied upon to make five-year findings. We agree that a statute defining a concept with a particular term in one subdivision but excluding it in another generally should not be interpreted to imply that term where excluded. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725.) But this general rule is not appropriate here, where one subdivision provides an *example* of an *option* for meeting a requirement and the other subdivision provides no examples. This is particularly true given the legislative history regarding the flexibility of

21

section 66001 not "specify[ing] the basis upon which" its requirements are met. (1987 Analysis, *supra*, at p. 2.)

Barajas then objects that City's CIP was not made in conjunction with an annual report and was not made within 180 days after the 2018 fiscal year. But these are requirements for the City's *findings* pursuant to section 66001, subdivision (d)(2) (section 66001(d)(2)), and section 66006, subdivision (b)(1). There is no indication that these provisions apply to the *evidence* used to support such findings. Barajas also argues that the CIP is insufficient because it does not "justif[y] or explain[]" the funding for impact fee projects. Again, nothing in section 66001, subdivision (d)(1)(C) or (d)(1)(D) requires such justification or explanation.

Finally, Barajas cites to purported "deficiencies" on nine pages of the CIP without reference to any record of raising these particular issues in the trial court, below. (*Dumas, supra*, 45 Cal.App.5th at p. 356, fn. 5.) Even if not forfeited, two of these pages are simply summaries of projects listed on other pages. Five of those other pages relate to projects (storage for reserved fire apparatus, playground replacements at specific parks, construction of a baseball diamond, seismic rehabilitation of a bridge, and construction of a river trail) that are not identified in the 2008 or 2012 reports. Section 66001, subdivision (d)(1)(C) and (d)(1)(D) require an agency to make findings on the sources, amounts, and dates of funding to complete financing for incomplete improvements "identified" when an agency establishes the impact fee. Barajas has failed to meet his burden to present sufficient facts or legal argument regarding how those requirements apply to these projects. Even if he had met this burden, the CIP contained information regarding funding sources, amounts, and dates for these projects. On the reserved apparatus storage project, for example, the CIP stated that City would be completing

22

the project in fiscal year 2019–2020, using $10,000 in fire suppression impact fees projected for that fiscal year and $40,000 in transient occupancy tax budgeted for fiscal year 2018–2019.

The remaining two pages relate to projects (remodel of two fire stations and Rainier Avenue cross-town connector) that *are* discussed in the 2008 and 2012 reports. The 2008 report identified the remodeling of the fire stations, and the 2012 report assigned $1,338,584 of the estimated costs to the impact fee program. An associated impact fee was approved. The CIP stated that City would be completing its remodel of the fire stations in fiscal year 2018–2019, using $98,000 from the fire suppression impact fees received through fiscal year 2017; $150,000 in transient occupancy tax estimated from fiscal year 2017–2018; and $86,000 in transient occupancy tax budgeted for fiscal year 2018–2019. Similarly, for the Rainier Avenue cross-town connector, the 2012 traffic report identified the project and assigned costs to impact fees, funds from the former Petaluma Community Development Commission (PCDC), and other sources. An associated impact fee was approved. The CIP stated that $38,449,000 was needed for the undercrossing structure and would come from $28,226,000 in total traffic mitigation impact fees: $1,717,000 projected for fiscal year 2019–2020; $2,250,000 projected for fiscal year 2020–2021; and $11,800,000 projected for both fiscal year 2021–2022 and fiscal year 2022–2023. It also identified PCDC as a source of $10,224,000 in funds: $3,224,000 received through fiscal year 2017 and $7,000,000 estimated from fiscal year 2017–2018. We agree with the trial court that the 2008 and 2012 reports, along with the 2018 report and CIP, provided sufficient evidence to support City's findings required by section 66001, subdivision (d)(1)(C) and (d)(1)(D).

In sum, we conclude there was substantial evidence to support the trial court's determination that City's five-year findings for the 2018 fiscal year were based on sufficient evidentiary support.[7]

## IV. *Forfeiture of Lateness Argument*

For the first time in his reply brief, Barajas also challenges the trial court's ruling that the two-month delay in City's findings for the 2018 fiscal year (adopted on February 25, 2019, instead of December 27, 2018) did not violate section 66001(d)(1) and did not "automatically trigger" a refund of unexpended impact fees.

"On appeal we need address only the points adequately raised by plaintiff in his opening brief on appeal." (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.) " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission.' " (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

We reject Barajas's contention that he properly raised the argument in his opening brief, as he relies on two references to the lateness of City's findings in the factual background section of that brief. The opening brief contains no legal argument that City's two-month delay violates section 66001(d)(2), let alone any argument made under separate heading with

---

[7] Given this conclusion, we need not address arguments made by the parties and amici curiae related to the remedy for failure to make sufficient findings under section 66001, subdivision (d), including whether such failure requires a refund (versus opportunity for agency to correct) and whether that refund includes all unexpended fees (versus unexpended fees held more than five years).

supporting citations to both legal authority and the record. (Cal. Rules of Court, rule 8.278(a)(2).) We deem the argument forfeited. (*Dumas, supra*, 45 Cal.App.5th at p. 356, fn. 5.)

In so doing, we also note that the bulk of Barajas's "legal argument" in his reply brief consists of quotations from *Hamilton & High, LLC v. City of Palo Alto* (2023) 89 Cal.App.5th 528 (*Hamilton*), new authority issued one month after his opening brief. According to Barajas, *Hamilton* "makes clear" that City's two-month delay "alone is sufficient to compel the City to refund."

But in *Hamilton*, the city of Palo Alto was required to make five-year findings by December 27, 2019. (*Hamilton, supra*, 89 Cal.App.5th at p. 540.) In January 2020, a plaintiff requested that Palo Alto refund certain parking fees because it had not provided five-year findings for those fees. (*Id.* at p. 539.) In February 2020, Palo Alto denied the request, stating that the fees were " 'currently committed' " to construction of a parking garage. (*Id.* at pp. 539–540.) In April 2020, the plaintiffs responded with a "detailed timeline" regarding the fees and the legal basis for their claim. (*Id.* at p. 540.) On May 11, 2020, Palo Alto's city council adopted a resolution making five-year findings, including findings "in connection with the parking fund and its anticipated use to construct a garage 'pending further discussion by the City Council regarding downtown parking management.' " (*Ibid.*) In other words, Palo Alto made findings more than a year after they were due and only after plaintiffs' demand for a refund based on its failure to do so. (*Ibid.*)

The appellate court concluded that the findings were untimely and noncompliant with section 66001(d)(2) and section 66006, subdivision (b)(1). (*Hamilton, supra*, 89 Cal.App.5th at p. 567.) In reaching this conclusion, however, the appellate court made clear: "As the City's adoption of the May

25

2020 five-year findings occurred *more than one year* after the end of the 180-day period, we have not been asked to and do not decide whether section 66001(d)(2)'s requirement that five-year findings be made 'in connection with' the annual public information findings required by section 66006, subdivision (b), might be satisfied on different facts." (*Hamilton*, at p. 567, fn. 13.)

Barajas's reply brief fails to provide any specific argument or authority regarding this open question from *Hamilton*, which is problematic because it is directly at issue here. Unlike the year-long delay in *Hamilton* remedied only after plaintiff intervention, City adopted its findings here less than two months late. And *Hamilton* not only declined to decide this question—whether delay of less than a year violates section 66001(d)(2)—but expressly acknowledged the possibility that the statutory requirement "might be satisfied on different facts." (*Hamilton, supra*, 89 Cal.App.5th at p. 567, fn. 13.) Barajas only offers a conclusory, contradictory statement that "the result is the same." It is not the responsibility of this court, or City, to consider this issue without timely or adequate presentation by Barajas.

## DISPOSITION

The judgment is affirmed. City is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

Jackson, P. J.

WE CONCUR:

Simons, J.
Chou, J.

A165258/*Barajas v. City of Petaluma*

26